## PEOPLE v BENNETT (AFTER REMAND)

Docket No. 91480. Argued November 10, 1992 (Calendar No. 4A). Decided May 25, 1993.

John and Sandra Bennett were convicted in the 35th District Court, John E. MacDonald, J., of four counts of failing to send their children to school during the 1985-86 school year in violation of the compulsory school laws. The Wayne Circuit Court, Richard P. Hathaway, J., affirmed. The Court of Appeals denied leave to appeal. In lieu of granting leave to appeal, the Supreme Court remanded the case to the Court of Appeals for consideration as on leave granted. Thereafter the Court of Appeals, DOCTOROFF, P.J., and MAHER and MARILYN J. KELLY, JJ., affirmed in an unpublished opinion. On rehearing, the Court clarified part of its rationale, but reaffirmed the convictions (Docket No. 109010). The Supreme Court, again in lieu of granting leave to appeal, remanded the case to the Court of Appeals. On remand, the Court again affirmed (Docket No. 134297). The defendants appeal, asserting a fundamental right under the Fourteenth Amendment to educate their children at home, and that application of the compulsory education law violated their statutory and due process rights because they were prosecuted without first having had an administrative hearing to determine whether they were in compliance with the private and parochial schools act.

I. In an opinion by Justice BRICKLEY, joined by Justices GRIFFIN and MALLETT, and a separate opinion by Justice BOYLE, the Supreme Court held:

Parents do not have a fundamental right requiring strict scrutiny under the Fourteenth Amendment to direct their children's secular education free from reasonable regulation. The state may reasonably regulate education, including the imposition of teacher certification and curricula requirements on home-school programs, in order to advance the legitimate

REFERENCES

Am Jur 2d, Schools §§ 228, 231, 232.

Religious beliefs of parents as defense to prosecution for failure to comply with compulsory education law. 3 ALR2d 1401.

interest of compulsory education. State interference with such rights deserves strict scrutiny only within the context of the First Amendment. Under minimal scrutiny, it was incumbent upon the defendants to show the unreasonableness of the certification requirement.

II. In an opinion by Justice BRICKLEY, joined by Justices GRIFFIN and MALLETT, and separate opinions by Justice LEVIN, joined by Chief Justice CAVANAGH, and by Justice RILEY, the Supreme Court further *held:*

The defendants were entitled, as administrators of a private home school, to a hearing as provided by the private and parochial schools act to determine whether their home school meets the requirements of the act before they could be prosecuted for failing to send their children to school in violation of the compulsory education laws.

Convictions vacated.

Justice BOYLE, dissenting in part, additionally stated that the private school act and the School Code have different purposes and distinct remedies. The administrative hearing required by the private school act applies to the operator of a school and is administered by the Department of Education. The department has no statutory role in the enforcement of the compulsory education law, which is administered by local school districts and prosecuting attorneys, and is directed to the responsibility of persons in parental relation with school-age children.

Justice RILEY, dissenting in part, additionally stated that MCL 388.553; MSA 15.1923 unconstitutionally abridges the defendants' right to direct the education of their children because it is an unreasonable regulation unrelated to the educational achievement of their children schooled at home. Although the state possesses a ·legitimate interest in ensuring the adequate education of the defendants' children, it has failed to support the proposition that the certification requirement is reasonably related to that interest.

188 Mich App 447; 470 NW2d 433 (1991) vacated.

1. CONSTITUTIONAL LAW — EDUCATION — FOURTEENTH AMENDMENT — HOME SCHOOLS — STATE REGULATION.

Parents do not have a fundamental right requiring strict scrutiny under the Fourteenth Amendment to direct their children's secular education free from reasonable regulation; the state may reasonably regulate education, including imposing teacher certification and curricula requirements on home schools, in order to advance the legitimate interest of compulsory education (US Const, Am XIV).

2. SCHOOLS — HOME SCHOOLS — PRIVATE SCHOOLS — COMPULSORY
EDUCATION.

Before parents who educate their children at home may be
prosecuted under the compulsory education laws for failing to
send their children to school, an administrative hearing pursu-
ant to the private and parochial schools act must be conducted
to determine whether the home school meets the requirements
of the act (MCL 380.1561, 338.554; MSA 15.41561, 15.1924).

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, *John D. O'Hair,* Pros-
ecuting Attorney, *Timothy A. Baughman,* Chief,
Research, Training and Appeals, and *Olga Ag-
nello,* Assistant Prosecuting Attorney, for the peo-
ple.

*Kallman & Cropsey* (by *David A. Kallman*) and
*Christopher J. Klicka* and *Michael P. Farris* for
the defendants.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, and *Paul J. Zimmer,* As-
sistant Attorney General, for the State Board of
Education.

*Mark Brewer* and *Paul Denenfeld,* of counsel,
for the ACLU Fund of Michigan.

AFTER REMAND

BRICKLEY, J. The issue before us is whether, in a
challenge not involving religious convictions, a
teacher certification requirement for home schools
violates a parent's right to direct a child's education
under the Fourteenth Amendment. The Bennetts,
in challenging the requirements, are claiming

that their Fourteenth Amendment right to direct the education of their children should be classified as a "fundamental right," thus making it impervious to the minimal scrutiny due process test. The state contends that the Court of Appeals properly applied the minimal scrutiny test and that the requirement was constitutionally justifiable. The defendants also claim that Michigan's compulsory education law, as applied, violated their statutory and due process rights because they were prosecuted without an administrative hearing to determine whether they were in compliance with the private and parochial schools act.

For the reasons that follow, we hold that a parent's Fourteenth Amendment right to direct a child's education is not one of those rights described by the United States Supreme Court as fundamental, and, thus, the strict scrutiny test is unwarranted. We further hold that the defendants were entitled under the statute, as administrators of a private home school, to the hearing provided by the private and parochial schools act before they could be prosecuted as parents who failed to send their children to school in violation of the compulsory education laws. As a result, we vacate the defendants' convictions and order the state superintendent to conduct a hearing to determine if the defendants' home school satisfies Michigan law.

I

John and Sandra Bennett and their four children, Scott, Erika, Jason, and Krista, live in Wayne County. In 1986, the defendants were charged with four counts of failing to send their

children to school during the 1985-86 school year.[1] After a trial before the 35th District Court, the defendants were found guilty and fined $50 for each count. The Wayne Circuit Court affirmed the defendants' convictions. Although the defendants appealed to the Court of Appeals, their application was denied. Subsequently, in lieu of granting leave to appeal, we remanded the case to the Court of Appeals for consideration as on leave granted.[2] After considering the merits of the case, the Court of Appeals affirmed the defendants' convictions. On a motion for rehearing, the Court of Appeals clarified part of its rationale, but again affirmed the convictions. 179 Mich App 225; 449 NW2d 899 (1989). Once again the defendants moved for leave to appeal to this Court, and again this Court remanded the case to the Court of Appeals, this

[1] Michigan's compulsory school attendance law provides:

[E]very parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday, shall send that child to the public schools during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled. [MCL 380.1561(1); MSA 15.41561(1).]

The exemption under which the defendants argued that their children need not be compelled to attend public school states:

A child shall not be required to attend the public schools in the following cases:
(a) A child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade, as determined by the course of study for the public schools of the district within which the nonpublic school is located. [MCL 380.1561(3)(a); MSA 15.41561(3)(a).]

[2] In the Court of Appeals, the case was consolidated with a case from Ottawa County, *People v DeJonge,* Docket No. 106149. However, this opinion addresses only the issues presented by defendants' convictions.

time for reconsideration in light of *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380; 455 NW2d 1 (1990). Again, the Court of Appeals affirmed the defendants' convictions. 188 Mich App 447; 470 NW2d 433 (1991).

The crux of the defendants' convictions concerns their decision to withdraw their four children from public school. Dissatisfaction with the public school system was their stated reason for their action, not any religious belief.[3] Defendants believed that they could provide their children a better education than the local public school, even though neither defendant is a certified teacher.

Defendants enrolled their children in the home based education program (HBEP) sponsored by Clonlara, Inc., of Ann Arbor, Michigan. The HBEP provides parents with a home instruction program, and allows parents to utilize the services of certified teachers and classrooms on the Ann Arbor campus. Defendants maintained that their children were often brought to the Ann Arbor campus and were instructed by certified teachers for a total of four to six hours per month.[4] Even more frequent contact between the children and the Clonlara teachers was maintained through the use of conference telephone calls from the defendants' home.

Defendants stated that they held classes for their children approximately five hours per day, five days per week, for the entire school year and made monthly attendance reports to Clonlara. The children studied math, English, spelling, reading,

[3] Indeed, defendants admitted that they considered sending their children either to a Catholic or Lutheran school, but decided they could not afford to do so. Instead, they chose to educate their children in their own home.

[4] Also during these visits, the Clonlara teachers reviewed the children's work and helped the defendants develop lesson plans and teaching techniques.

writing, science, social studies, history, and art. At the beginning of the school year, defendants submitted proposals for four individualized curricula to the superintendent of the Plymouth-Canton School District, the district in which the children had been attending school.[5] At the end of the school year, standardized achievement test results indicated that three of the four children were either at or above their grade level.[6]

Despite their attempts to teach their children at home, defendants were convicted of failing to send their children to school in violation of Michigan's compulsory education laws. The trial court found that the children were not being properly taught at home because the parents were not in compliance with Department of Education guidelines for educating children in the home.[7] Specifically, the

[5] There is, however, testimony in the record that disputes this.

[6] The results showed that Scott, who had fallen below his grade level while attending public school, had made steady progress toward his proper grade level during his year at home. Jason's test scores indicated that he was at the proper grade level, and Erika and Krista tested above their grade levels.

[7] In its publication entitled "Education of the Child in the Parental Home," the Department of Education interpreted several provisions of Michigan laws in order to establish guidelines for parents wishing to teach their children at home. The guidelines require that

(1) all instruction must be given by a teacher certified by the state to teach the subjects being taught, and the certificates evidencing this must be registered with the Intermediate Superintendent's office (MCL 380.1532[1]; MSA 15.41532[1]);

(2) the home curriculum must be comparable to that offered by the local public·school, and the parents must obtain a statement to this effect from the local superintendent who must also keep a copy on file in his office (MCL 380.1561[3][a]; MSA 15.41561[3][a]);

(3) children schooled at home must be provided with a minimum of 180 days and 900 hours of instruction, with adjustments allowed to provide adequate supervision of work; schools with six or more students must comply with school fire safety standards; attendance records must be kept to substantiate the day and hour instruction requirements for each child (MCL 388.551; MSA 15.1921);

court found that 1) defendants failed to utilize the services of a certified teacher for at least a substantial portion of the school day, 2) there was no proof of use of a curriculum that was comparable to that used in the public school, 3) there was no evidence that the children were instructed for at least 180 days and 900 hours,[8] and 4) there were no attendance records offered to substantiate the claims of the hours and days the children received instruction.

The trial court paid particular attention to the defendants' claim that their children received instruction from certified teachers. Defendants asserted that two women, Pearl Wander and Julie Kuhar, provided instruction to the children. The court found, however, that the instruction provided by these women did not satisfy the state's requirements. Ms. Wander, for example, while certified to teach, was never shown to have actually visited the Bennett home. Instead, Ms. Wander had contact with the children through the occasional use of a speaker phone and the family's occasional visits to the Clonlara campus for a total of four to six hours per month. This contact, the court found, was not sufficient to meet the state's requirements. Rather, the court concluded, Ms. Wander's role with respect to the children was that of a supervisor, not a teacher.[9] With regard to

---

(4) courses pertaining to the United States Constitution, the Michigan Constitution, the history and present form of government of the United States, Michigan, and the political subdivisions and municipalities of Michigan must be taught in the home school, and parents must provide the local superintendent with a statement that these subjects are being taught (MCL 380.1166[1]; MSA 15.41166[1]).

[8] It should be noted here that the days and hours requirement is no longer a valid interpretation of existing state law. See *Clonlara, Inc v State Bd of Ed,* 442 Mich 230; 501 NW2d 88 (1993).

[9] The testimony indicated that during those infrequent visits to the

Ms. Kuhar, the court noted that she was not in fact certified to teach at the time of her contact with the Bennett children.[10]

The fact that defendants were not substantially utilizing the services of a certified teacher and were not themselves certified to teach was sufficient for the trial court to find them guilty of failing to send their children to school. As a result, the trial court 1) required defendants to contact the local public school and arrange to have their children tested for the purposes of academic achievement and grade placement, 2) required defendants to immediately arrange for their children to be taught by certified teachers, and 3) fined each of the defendants $50.

On appeal in the Court of Appeals, defendants raised five issues for review, two of which are now before this Court.[11] The Court of Appeals first addressed the defendants' contention that the teacher certification requirement violated the Fourteenth Amendment right of parents to direct their children's education. It recognized the existence of the right and that the right was protected

_____

Clonlara campus, Ms. Wander's time was spent primarily in testing the children and reviewing their past papers. There was no testimony indicating new subjects were covered during these visits. Moreover, the evidence indicated Ms. Wander was assigned to supervise sixteen children in five locations in southeastern Michigan.

[10] Apparently defendants were satisfied by the court's decision on this issue. On appeal, defendants make no reference to Ms. Kuhar. Rather, defendants argued that their children received instruction from Ms. Wander and Dr. Montgomery, Clonlara's director. It is undisputed that both these women are certified teachers. Dr. Montgomery's contact with the Bennett children was the same as Ms. Wander's.

[11] Defendants did not raise the remaining three issues in this Court; therefore, we need not address them. Those issues related to whether the school attendance law was impermissibly vague as applied to "home schools," whether the use of the School Code to regulate "home schools" violated the Michigan Constitution's title-object requirements, and whether there was sufficient evidence to support the defendants' convictions.

under the personal substantive due process guarantees of the Fourteenth Amendment. However, it found that where the requirement was rationally related to some legitimate state purpose, the law would be upheld. The Court was satisfied that the state's purpose was legitimate.

The Court of Appeals then addressed the defendants' contention that the compulsory attendance law violated their Fourteenth Amendment procedural due process rights. The right to notice and a hearing, defendants contended, was also required by the private and parochial school act, because their children could not be forced to attend a public or other approved private school until after a hearing established that defendants' "home school" did not comply with the act.[12]

The Court rejected the defendants' argument,

---

[12] Section 4 of the private and parochial schools act provides in full:

In event of any violation of this act the superintendent of public instruction shall serve the person, persons, corporation, association or other agencies who operate, maintain and conduct a private, denominational or parochial school within the meaning of this act with a notice, time and place of hearing, such hearing to take place within fifteen [15] days after the date of said notice and at a place located in or conveniently near the county where such violation took place, accompanied by a copy of the complaint stating the substance of said violation: Provided, That no person shall be called to attend any such hearing on any day observed by him as the Sabbath. If at such hearing the superintendent of public instruction shall find that the violation complained of has been established he shall then serve said person, persons, corporation, association or other agencies with an order to comply with the requirements of this act found to have been violated within a reasonable time not to exceed sixty [60] days from the date of such order: Provided, That in the event that such order refers to sanitary conditions that the said person, persons, corporation, association or other agencies shall have six [6] months in which to remedy the defect. If the order of the superintendent of public instruction as specified in said notice shall not have been obeyed within the time specified herein said superintendent of public instruction may close said school and prohibit the said person, persons, corporation, association or other agencies operating or maintaining such private, denominational or parochial school from maintaining said school or from exercis-

however, on the ground that defendants had no school to close. Recognizing that "school" was not defined in the private and parochial schools act, the Court stated that the Legislature could not have envisioned the type of home-based program defendants utilized when it enacted the law in 1921. On the contrary, citing an opinion of the Attorney General, the Court of Appeals stated that only under limited circumstances can a home-based program become a school. *People v Bennett,* unpublished opinion of the Court of Appeals, decided August 8, 1989 (Docket No. 109010) (citing OAG, 1979, No 5579 [September 27, 1979]). The Court noted that the Attorney General found that when a parent holds a Michigan teaching certificate and provides instruction and sanitary conditions comparable to the public schools, the parent is providing his child with an education from a private school. The Court pointed out again that neither defendant was certified to teach and that the school district made no finding of comparable curricula. As a result, the Court found that the defendants' home program was not a "school" within the meaning of the private and parochial

ing any of the functions hereunder until said order of the superintendent of public instruction has been complied with. The children attending a private, denominational or parochial school refusing to comply with the requirements hereof after proceedings herein set forth shall be compelled to attend the public schools or approved private, denominational or parochial school under the provisions of the compulsory education act, the same being act number two hundred [200] of the public acts of nineteen hundred five [1905], as amended. And it shall be the duty of the person or persons having charge of the enforcement of the said compulsory education act, upon notice from the superintendent of public instruction that said private, denominational or parochial school has not complied with the provisions hereof, to compel the attendance of the children of said school or schools at the public schools or approved private, denominational or parochial school. [MCL 388.554; MSA 15.1924.]

schools act and that defendants were not entitled to any hearing before prosecution under the compulsory education laws.

Satisfied that the statutes at issue were consistent with the Fourteenth Amendment's substantive and due process guarantees, the Court of Appeals affirmed the defendants' convictions and denied their requested relief on all issues raised.

II

Defendants argue that there is state and federal case law in support of their contention that, as parents, they have a fundamental right to direct their children's education.[13] We do not, however, find that the cited cases should be so interpreted. Indeed, we have not found and defendants have not presented *any* case that finds the existence of a Fourteenth Amendment fundamental right of parents to direct their children's secular education free of reasonable regulation.[14] We conclude that parents *do not* have such a constitutional right requiring a strict scrutiny standard. On the contrary, the state may reasonably regulate education, including the imposition of teacher certification and curricula requirements on home-school

---

[13] A fundamental right has been defined as that which the United States Supreme Court "recognizes as having a value so essential to individual liberty in our society that [it justifies] the justices reviewing the acts of other branches of government . . . ." 2 Rotunda & Nowak, Constitutional Law (2d ed), § 15.7, p 427.

[14] In fact, the United States Supreme Court, in *Runyon v McCrary*, 427 US 160, 178; 96 S Ct 2586; 49 L Ed 2d 415 (1976), in which the Court noted that it has

repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation.

programs, in order to advance the legitimate interest of compulsory education.

### A

Defendants contend that the Fourteenth Amendment guarantees them the *fundamental* right to direct the education of their children, even when the desire to direct education does not stem from any religious belief. Defendants cite *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925), for the proposition that it is beyond a state's authority to interfere with parents' choice of private education for their children. Similarly, defendants argue, the State of Michigan is telling parents that their children may be taught only by state-certified teachers, the same type of teachers who teach in public schools. Without explicitly so stating, defendants infer that because the state requires the same type of teachers for both private[15] and public schools, it is blurring the distinction between these schools and thus interfering with a parent's right to choose private schools for their children.

Defendants also quote at length from *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972), which held that parents have the right to take their children out of high school and give them informal vocational training in order to protect sincerely held religious beliefs. The defendants noted in *Yoder* that the Supreme Court emphasized the case involved the "fundamental interest of parents, as contrasted with that of the State, to guide the *religious* future and education of their children. The history and culture of Western civilization reflect a strong tradition of paren-

---

[15] The defendants' argument they are operating a "private" school in their home will be discussed below.

tal concern for the nurture and upbringing of their children." *Id.* at 232 (emphasis added).

The defendants' reliance on most of the cases cited is misplaced because those cases deal with religious issues under the First Amendment. This case is specifically not about religion and must be so considered. For example, in a broad sense, *Pierce* stands for the proposition that parents have a right to choose either public or private education for their children.[16] In a narrow sense, *Pierce* has been interpreted as providing parents the right to direct the religious education of their children.[17] In no sense, however, has *Pierce* been interpreted to mean that parents have a fundamental right to direct all of their children's education decisions.[18] *Pierce* does not, therefore, stand for the position that parents have a fundamental right to direct their children's education under all circumstances,

[16] See, e.g., *Griswold v Connecticut,* 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965) (noting that the First Amendment, as decided in *Pierce,* includes parents' right to choose public, private, or parochial school for children); *Ohio v Whisner,* 47 Ohio St 2d 181; 351 NE2d 750 (1976) (the highest state court struck down education standards as being violative of *Pierce* because they effectively eradicated the distinction between public and nonpublic education within the state).

[17] Note, however, the state's argument that *Pierce* is limited as precedent because all discussion of parental rights was dicta. The state noted that *Pierce* struck down a law that eliminated alternatives to public education as an infringement upon private institutions' property rights in conducting their businesses. It is conceded, however, that *Pierce* is better known for its discussion of parental rights than of property rights.

[18] Indeed, consider this view of *Pierce* in Justice White's concurring opinion in *Yoder, supra* at 239:

*Pierce v Society of Sisters* [citation omitted], lends no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society; in *Pierce,* both the parochial and military schools were in compliance with all the educational standards that the State had set, and the Court held simply that while a State may posit such standards, it may not pre-empt the educational process by requiring children to attend public schools.

and so the defendants' reliance on *Pierce* for this reason is mistaken.

The defendants' misplaced reliance on *Yoder* is even more obvious. Hardly a page of that opinion can be read without seeing at least one reference to the parents' religious beliefs. Indeed, the Court discussed the case in terms of having to balance the state's interest in universal education with the First Amendment and "the traditional interest of parents with respect to the religious upbringing of their children . . . ." *Yoder,* 406 US 214 (citing *Pierce,* 268 US 535). In determining that the parents in *Yoder* could remove their children from school after the eighth grade in spite of the compulsory education laws, the Court specifically noted that it was dealing with a "centuries-old religious society,"[19] and not "with a way of life and mode of education by a group claiming to have recently discovered some 'progressive' or more enlightened process for rearing children for modern life."[20] The defendants' argument that *Yoder* lends support to the claim that parents have *any* rights to remove their children from school for nonreligious reasons is completely without merit.[21]

---

[19] *Yoder,* 406 US 235, n 22.

[20] *Id.* at 235.

[21] *Yoder,* in fact, rejected the idea a similar holding was likely where something other than a religion-based argument was made. The Court emphasized the religion argument was central to its decision:

> The very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion clauses. [406 US 215-216.]

In further support of their contention that the Fourteenth Amendment provides a fundamental right to direct the education of their children, defendants cite *Meyer v Nebraska*, 262 US 390; 43 S Ct 625; 67 L Ed 1042 (1923), in which the state tried to prohibit private, denominational, parochial, or public schools from teaching in any language other than English to students who had not reached the eighth grade. Defendants contend that this case stands for the proposition that the state could not interfere in parental choices for children's education in this manner because it interfered "with the power of parents to control the education of their own children."[22] *Meyer,* 262 US 401.

The defendants' reliance on *Meyer* is misplaced partially for the same reason that reliance upon *Pierce* is misplaced.[23] At issue in *Meyer* was whether a statute that prohibited teaching foreign languages denied the defendant teacher his liberty as guaranteed by the Fourteenth Amendment. 262 US 399. The only reference to parental rights in the entire opinion consists of one sentence noting that the ban on languages had the effect of interfering with "the calling of modern language teachers, with the opportunities of pupils to acquire knowledge, and with the power of parents to control the education of their own." *Id.* at 401. While *Meyer* may have made one general statement concerning parental rights to control their children's education, it certainly does not stand for the proposition that the Fourteenth Amendment guarantees parents the fundamental right to di-

---

[22] Defendants also cite *Bartels v Iowa,* 262 US 404; 43 S Ct 628; 67 L Ed 1047 (1923), for the same proposition.

[23] The defendant in *Meyer* was a teacher, not a parent, and thus any discussion of parental rights was dicta at best.

rect their children's education free from reason-
able regulation.[24]

Defendants contend that the Supreme Court's
most recent affirmation of this fundamental right
is found in *Employment Div, Dep't of Human
Resources v Smith,* 494 US 872; 110 S Ct 1595; 108
L Ed 2d 876 (1990). *Smith* recognizes this parental
right as fundamental, defendants contend, because
it held that strict scrutiny must be applied when
evaluating state actions that interfere with the
rights of parents to direct their children's educa-
tion. In support of this contention, defendants
quote *Smith:*

> *Yoder* said that "the Court's holding in *Pierce*
> stands as a charter of the rights of parents to
> direct the religious upbringing of their children.
> And, when the interests of parenthood are com-
> bined with a free exercise claim . . . more than
> merely a "reasonable relationship to some purpose
> within the competency of the State" is required to
> sustain the validity of the State's requirement
> under the First Amendment. [*Id.* at 881, n 1 (quot-
> ing *Yoder,* 406 US 233).]

This, defendants conclude, "reaffirms the applica-
bility of the compelling interest test to a claim of
Fourteenth Amendment parental rights standing
alone."

Perhaps the defendants' most creative interpre-
tation is of the *Smith* decision. The quotation
above explicitly states that it is only when the
interests of parenthood are combined with the

---

[24] For the same reasons, the defendants' reliance on *Bartels,* n 22
*supra,* is misplaced. Indeed, the entire substantive text of *Bartels*
consists of the following sentence: "[t]he several judgments entered in
these causes by the Supreme Courts of Iowa, Ohio and Nebraska,
respectively, must be reversed upon authority of *Meyer v Nebraska,*
decided today . . . ." 262 US 409. Having added no substantive
argument, further analysis of *Bartels* is unnecessary.

Free Exercise Clause (a claim defendants are not making) that parents are entitled to constitutional protection of a fundamental right. Nowhere in the opinion does the Court make as bald a statement as the defendants' reading of *Smith*. Rather, as the state pointed out, defendants ignored *Smith's* clear language and persistently maintain their position despite a directly contradictory holding.

These cases, defendants are convinced, exemplify the United States Supreme Court's recognition of a Fourteenth Amendment fundamental right in parents to direct the education of their children. When considered with other cases that defendants argue apply the fundamental rights of parents found in *Pierce* to home-school situations,[25] they are convinced that the constitution guarantees them the fundamental right to educate their children at home. They may teach their children on their own, defendants conclude, because if the Fourteenth Amendment allows them to direct their children's education, they ought to be able to provide that education themselves.

Clearly the Supreme Court cases to which defendants refer do not support their contentions.[26]

___

[25] In support of this contention, defendants cite the following cases without explanation: *Mazanec v North Judson-San Pierre School Corp*, 614 F Supp 1152 (ND Ind, 1985), aff'd 798 F2d 230 (CA 7, 1986); *Ellis v O'Hara*, 612 F Supp 379 (ED Mo, 1985), rev'd on other grounds 802 F2d 462 (CA 8, 1986); *Care and Protection of Charles*, 399 Mass 324; 504 NE2d 592 (1987).

[26] Additionally, even those cases defendants cited in support of applying strict scrutiny in reality applied only minimal scrutiny. See e.g., *Farrington v Tokushige*, 273 US 284, 298; 47 S Ct 406; 71 L Ed 646 (1927) (the Court held prohibition of foreign language schools to be unreasonable interference with parents' interests in having children taught in their native language); *Pierce, supra* (the Court struck down an Oregon law prohibiting private schools, in part because they unreasonably interfered with the parents' liberty interest in directing their child's education); *Meyer, supra* (the Court struck down a ban on teaching foreign languages because it unreasonably interfered with the teachers' liberty interests).

While strict scrutiny was used in *Prince v Massachusetts,* 321 US

Similarly, the home-school cases do not support the defendants' claims. The parents in *Mazanec v North Judson-San Pierre School Corp,* 614 F Supp 1152 (ND Ind, 1985), aff'd 798 F2d 230 (CA 7, 1986), *Ellis v O'Hara,* 612 F Supp 379 (ED Mo, 1985), rev'd on other grounds 802 F2d 462 (CA 8, 1986), and *Care and Protection of Charles,* 399 Mass 324; 504 NE2d 592 (1987), all taught their children at home because of religious convictions. In fact, the *Mazanec* court specifically held that "within the ambit of the free exercise clause [there is] a constitutional right to educate ones [sic] children in an educationally proper home environment . . . ." 614 F Supp 1160. These cases do, indeed, recognize the choice of a home school as protected under a parent's fundamental right, but only under the fundamental right to direct a child's religious education.

Also of interest is the fact that, while defendants cited no Michigan home-school cases, there are at least two that are directly relevant. One is of particular importance because defendants were parties. In *Clonlara, Inc v Runkel,* 722 F Supp 1442 (ED Mich, 1989), the United States District Court for the Eastern District of Michigan held that defendants (and one other home-school couple)

> may have the right to choose home based education over public school education or other private school education. However, such home schooling, in the absence of a claim based on religious beliefs, may be subject to reasonable government regulation. Plaintiffs here have no fundamental right to educate their children at home free from reasonable government regulation. [*Id.* at 1458.]

158, 166; 64 S Ct 438; 88 L Ed 645 (1944), it was used to strike down a law that interfered with a custodian's right to direct her custodial child's religious upbringing. *Id.* at 159-160.

In *Hanson v Cushman,* 490 F Supp 109 (WD Mich, 1980), home-school parents argued that parents' fundamental rights to direct their children's education arose from the penumbrae of the First, Ninth, and the Fourteenth Amendments. However, the court rejected this argument for basically the same reasons that the arguments here fail. See *id.* at 112-114. Although the Hansons cited some of the same cases as the defendants (i.e., *Meyer, Pierce, Yoder,* etc.), the court pointed out that language taken from these cases was dicta at best. *Id.* at 112. While giving these cases due consideration, the court concluded that the Hansons' asserted rights were nothing more than personal or philosophical choices and were, therefore, not within the bounds of constitutional protection. *Id.* at 114. The court, too, concluded that there is no fundamental parental right to direct a child's secular education.

Finally, defendants argue that this Court has already decided that the state cannot require certified teachers. In support of this argument, defendants refer to Justice RILEY's conclusion in *Sheridan Rd Baptist Church v Dep't of Ed,* 426 Mich 462, 565; 396 NW2d 373 (1986), cert den 481 US 1050 (1987), confirmed by a majority of the Court in *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380; 455 NW2d 1 (1990), as standing for the proposition that teacher certification requirements are not compelling enough to interfere with parental rights guaranteed by the First and Fourteenth Amendments.[27]

Defendants have completely misconstrued the context in which Justice RILEY's statement was

[27] The portion of Justice RILEY's dissenting opinion to which defendants refer states "enforcement of the teacher certification requirement, as applied, is not essential to achieve that objective. Unless and until the state can show otherwise, the enforcement of the statutory teacher certification requirement, as applied, would be violative of the

made. By reviewing Justice RILEY's opinion in
*Sheridan Rd,* it becomes clear that her reference
to the Fourteenth Amendment was in connection
with a First Amendment claim. Indeed, the entire
thrust of the lawsuit pitted the state's interest in
ensuring quality instruction in nonpublic religious
schools against the parents' freedom of religion
claims.

Despite defendants' contention, neither this
Court nor any other court has held that parents
have a fundamental right to direct their children's
education under all circumstances. Rather, state
interference with such rights deserves strict scru-
tiny only within the context of the First Amend-
ment.

### B

Having found strict scrutiny unnecessary be-
cause of the absence of a fundamental right, the
state's teacher certification requirement need only
satisfy the minimal scrutiny test. Although not
analyzed in the courts below[28] or raised by the
defendants before this Court or the courts below,
the dissenting opinion concludes that the teacher
certification requirement does not survive the
"reasonably related to a legitimate state interest"
standard applied to ordinary regulatory measures
that affect nonfundamental rights. Furthermore,
while purportedly applying this standard, the dis-
senting opinion applies a strict scrutiny require-
ment by placing the burden of proof upon the
state, rather than on the party attacking the

---

First and Fourteenth Amendments." *Sheridan Rd Baptist Church v
Dep't of Ed, supra* at 565.

[28] In its only reference to this test, the Court of Appeals said: "The
correct test is whether the state's regulation bears a rational relation-
ship to some legitimate state purpose. The state certification require-
ment meets this standard of review." 179 Mich App 238 (citation
omitted).

challenged regulation.[29] "[T]he state failed to provide any evidence proving a correlation between the teacher certification requirement and educational achievement . . . ," (*post,* p 357); "[n]or does the state argue that the Bennetts' education of their children is not 'meritorious' or poses 'peculiar circumstances or present[s] emergencies which demand extraordinary measures relative to primary education.' " (*Post,* p 356.)

In general, it can be assumed the state has an interest in seeing that all children within its borders are properly educated.[30] Specifically, in a previous case in federal court, the same Michigan teacher certification requirements were recognized as a reasonable means to a legitimate state interest. *Hanson, supra* at 115. We also find that ensuring the minimum competence of those entrusted to teach to be, at the very least, a legitimate state interest.[31] Under the second part of the minimal scrutiny test, a state law prevails if it is in any way reasonably related to the state's interest.

[29] The United States Supreme Court, in *Mathews v Lucas,* 427 US 495, 511; 96 S Ct 2755; 49 L Ed 2d 651 (1976), noted that, within the minimal scrutiny test, the party challenging the regulation bears the burden of establishing the unreasonableness of the state action. See also *Clonlara,* 722 F Supp 1458, in which a federal district court implied that a successful challenge to Michigan's teacher certification requirement demands a showing that the requirement is not reasonably related to the state's legitimate interest.

[30] The United States Supreme Court, in *Prince v Massachusetts,* 321 US 168, recognized that a state's authority over children's activities is broader than its authority over similar actions of adults. Indeed, the Court noted "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Id.*

[31] The state, in *Hanson,* argued that if there were no teacher certification requirements, considerable expense would be required for the state to examine and supervise a wide variety of facilities and individuals, widely scattered throughout the state, who might wish to instruct children at home. 490 F Supp 115. The state asserted that a uniform teacher certification requirement was a less expensive and more efficient way to maintain competency among those teaching children within the state. *Id.*

Such a relationship is not difficult to establish because a challenge fails if the relationship is " 'at least debatable.' " *Metropolitan Life Ins Co v Ward,* 470 US 869, 881; 105 S Ct 1676; 84 L Ed 2d 751 (1985).

Across the country, state and federal courts have upheld home-school regulations simply on the ground that they were reasonable state actions.[32] For example, having found no fundamental parental right to direct a child's education free from reasonable government regulation, the *Clonlara* court upheld the same teacher certification requirements at issue here. 722 F Supp 1458. Similarly, the United States Court of Appeals for the Eighth Circuit in *Murphy v Arkansas,* 852 F2d 1039 (CA 8, 1988), upheld the Arkansas Home School Act because, even though it required compliance with several procedures before a child could be lawfully taken from a public or private school and taught at home, the court was satisfied that the state had a rational reason for the comprehensive regulation.[33]

---

[32] See, e.g., *In re Sawyer,* 234 Kan 436; 672 P2d 1093 (1983) (laws regulating public school alternatives, minimum hours of instruction, and teacher competency have a rational relationship to the legitimate state purpose of educating children); *In re Kilroy,* 121 Misc 2d 98; 467 NYS2d 318 (1983) (infrequent, unobtrusive home visits by a nonpublic school evaluation committee were deemed a reasonable means for advancing the legitimate state interest, despite parental rights); *People v Turner,* 121 Cal App 2d 861; 263 P2d 685 (1953), app dis 347 US 972 (1954) (rules regulating nonpublic schools were reasonable and not violative of the parental right to determine how and where children were to be educated).

[33] The state advanced three primary reasons for the comprehensive regulation of home schools. First, the state argued non-home schools encouraged more formality and structure than did home schools. This argument led the state to believe more serious instruction would occur in other than the relaxed atmosphere of the home. 852 F2d 1044. Second, the state argued that the likelihood more than one family sends their children to non-home schools provides an additional objective indication of the school's quality that is absent in the home-school situation. *Id.* Finally, the state argued, unlike home-school parents, parents sending their children to public or private

The dissent lists several reasons for its conclusion that teacher certification is not reasonably related to what it perceives to be the state's interest. We find these arguments to be unpersuasive. The fact that the state has not contested the adequacy of the defendants' instruction is irrelevant in light of the fact it is defendants' burden to prove the unreasonableness of the certification requirement.[34] As Justice MALLETT's dissent in *People v DeJonge (After Remand)*, 442 Mich 266, 304-305; 501 NW2d 127 (1993), points out, the mere existence of other, even less restrictive, home-school regulations in our sister states tells us little about those states' interests, whether they are the same as or different from Michigan's, and whether their regulations relate reasonably to those interests. And, in any event, the number of states that do not require certified teachers for home schools is not as universal as suggested. In addition to California, Alabama[35] and Nebraska[36] require certified teachers, and the Kansas Supreme Court has found that the state's compulsory attendance laws, in effect, prohibit home schools.[37] We are simply unconvinced there is any reason to find that the teacher certification requirement is

schools must pay for those schools (through taxes or tuition) and so would be more likely to demand their money's worth of quality education for their children. *Id.* These factors, the court was convinced, provided the state with a legitimate reason for the home-school requirements. *Id.*

[34] If it were the state's burden, we believe the state would be able to show the ultimate inadequacy of instruction. On the basis of the trial transcript, there is a strong indication the defendants would have difficulty instructing the children as they encountered the demands of the high school curriculum.

[35] Alabama parents teaching their children at home for other than religious reasons must be state certified to teach. See Ala Code 16-28-1 *et seq.*

[36] Home-school parents in Nebraska are exempted from the state's teacher certification requirement only when existing state regulation is in conflict with religious beliefs. See Neb Rev Stat 79-1701(2).

[37] See *In re Sawyer*, n 32 *supra*.

anything but at least reasonably related to the state's legitimate interest.

In the case at bench, it was incumbent upon defendants to show the unreasonableness of the certification requirement,[38] and they have been unable to do so. Neither the defendants nor the dissenters have cited, and we have not found, any case holding that a state's teacher certification requirement is unreasonable in its relationship to the state's legitimate interests. We are convinced, therefore, that the requirement is not unreasonable. Teacher certification can measure, and to some extent ensure, the minimum qualifications of each teacher. Certification is, therefore, at least not an unreasonable way to further the state's interest.[39]

### III

In arguing that they were entitled to a hearing,[40] defendants contend that before they can be prosecuted under the compulsory attendance law,[41] they are entitled to a hearing provided by the

---

[38] See *Mathews v Lucas*, n 29 *supra*, p 511.

[39] Because home schooling attracts some of the most resourceful and dedicated of parents who are often in least need of regulation or supervision in carrying out one of the most fundamental responsibilities of family and state, we would hope that the regulators could find a regulatory scheme that would allow the flexibility needed by the home-school proponents without leading to abuses that could occur if some of the least responsible among us were to take advantage of the opportunity to avoid compulsory attendance at non-home schools. That delicate task, however, is not ours, and, unlike a strict scrutiny test, the reasonable regulation standard does not require the least intrusive or the most creative regulatory scheme.

[40] Defendants spend considerable time, in the context of this issue, arguing the facts of their case—that they were in fact in compliance with the teacher certification and minimum days and hours requirements. However, because of our decision to remand the case for a hearing, it is not necessary to determine whether defendants were in compliance with the rules relating to home schools.

[41] See n 1 for the text of the relevant provisions of the compulsory education law.

private and parochial schools act.[42] Defendants assert that they are entitled to this hearing because they are a "state approved school" as defined by the School Code.[43] Defendants point out that there are no formal procedures for approving nonpublic schools; all that exist are procedures for finding that self-proclaimed nonpublic schools are not in compliance with the private and parochial schools act.[44] Defendants argue, therefore, that

[42] For the text of the relevant provision of the private and parochial schools act, see n 12.

[43] The School Code defines a "state approved nonpublic school" as a "nonpublic school which complies with Act No. 302 of the Public Acts of 1921, as amended, being sections 388.551 to 388.558 of the Michigan Compiled Laws [§§ 15.1921 to 15.1928 of the Michigan Statutes Annotated]." MCL 380.6(8); MSA 15.4006(8). The act to which this definition refers is the private and parochial schools act.

Compliance with this section is important for defendants because the compulsory attendance laws provide an exemption from mandatory public school attendance for

[a] child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade, as determined by the course of study for the public schools of the district within which the nonpublic school is located. [MCL 380.1561(3)(a); MSA 15.41561(3)(a).]

[44] In support of this assertion, defendants refer to a stipulation entered into by the superintendent of education, Phillip E. Runkel, in a similar case. In *DeJonge v Superintendent of Public Instruction*, unpublished stipulation and order of the Ingham Circuit Court, entered July 22, 1986 (Docket No. 85-56712-AW), the state superintendent agreed that

[t]here is no approval or licensing procedure pursuant to any state statute or administrative rule which requires a private home school, or a private, nonpublic school of any kind, to be approved or licensed by the Department of Education of the State of Michigan prior to that school's opening for operation or during the school's ongoing operation.

Furthermore, the state superintendent agreed that the Department of Education's authority was limited to disapproving those private, nonpublic schools, pursuant to the administrative procedures promulgated under the private and parochial schools act, where there has been a finding of noncompliance.

they are a nonpublic school within the meaning of
the law until the state superintendent finds them
not to be in compliance with the private and
parochial schools act. Furthermore, it is only after
the superintendent finds them not to be in compli-
ance that the state can prosecute them for failing
to comply with the compulsory education laws.

While we disagreed with defendants regarding
the first issue, we agree that they were entitled to
a hearing before being prosecuted under the com-
pulsory education laws. This conclusion is compli-
cated, however, by the absence of any Michigan
statute relating specifically to home schools.[45]
While all may agree that such schools are not
illegal per se,[46] there is no agreement about how
they should be run. The compulsory education
laws require parents to send their children to
public school, *unless* the children are attending
"state approved nonpublic school[s]."[47] Thus, a
home school is valid only if it can be considered a
state-approved nonpublic school. The School Code
defines a "state approved nonpublic school" as one
that meets the requirements of the private and
parochial schools act.[48] Therefore, to be valid, a

---

[45] Indeed, there is no consensus among those involved in this case
with regard to what law should be applied. Both Sandra Bennett and
Dr. Montgomery testified that the defendants' home program was not
a private school (implying the inapplicability of the private and
parochial schools act). Dr. Montgomery asserted, however, that such
programs are treated as private schools because of the absence of any
other specifically applicable legislation.

Shirley Waters, the attendance officer for the Plymouth-Canton
School District, testified explicitly that the private and parochial
schools act did not apply to home-school programs. However, in
determining that defendants violated the compulsory education laws,
Ms. Waters considered those factors listed in that act.

[46] See, generally, *Clonlara, Inc v Runkel, supra* (accepting without
argument the legality of home schools in general). But see *State v
Lowry,* 191 Kan 701; 383 P2d 962 (1963) (inferring home schools are
no longer a valid alternative to public school attendance).

[47] For the text of the compulsory education laws, see n 1.

[48] See n 43 for the complete definition of "state approved nonpublic
school."

home school must meet the requirements of the private and parochial schools act. Indeed, the state prosecuted defendants, inter alia, because their home-school program did not utilize the services of a certified teacher, nor did they provide proof of a curriculum comparable to that offered by the public school. These requirements are the same as those required by the private and parochial schools act. If defendants can be prosecuted for failing to comply with certain provisions of the private and parochial schools act, it would seem that there is no reason why all of the act's provisions should not apply to defendants, including the provision requiring a hearing before the state may close a nonpublic school.

This position is supported by § 4 of the act, which imposes a duty upon the person responsible for enforcing the compulsory education laws,[49] upon notice from the state superintendent that a nonpublic school is not in compliance with the act, to make sure that the children from the school are compelled to attend some other school.[50] As amicus curiae Department of Education points out, these provisions cannot be confused simply because the school administrators and parents are the same people. As we read this provision, where home schools are involved, once the state superintendent determines that a home school is not in compliance with the private and parochial schools act, and that school is closed, the superintendent has a duty to notify the relevant school district's attendance officer. *At this point,* the attendance officer may initiate criminal proceedings against the parents for failing to send their children to school in

---

[49] The person responsible for enforcing the compulsory education laws is the relevant public school district's attendance officer.

[50] For the text of § 4, see n 12.

violation of the compulsory education laws. In essence, what defendants argue is correct: before home-school parents can be prosecuted under the compulsory education laws for failing to send their children to "school," it must first be determined that the involved home school does not meet the requirements of the private and parochial schools act.

The Court of Appeals rejected this argument because it decided defendants had no school to close. The Court based this decision on the findings that, inter alia, there were no certified teachers or comparable curricula; but this is precisely the criteria that the state superintendent reviews in determining whether a nonpublic school is complying with the private and parochial schools act.[51] The Court found this treatment to be consistent with the Attorney General's treatment of the issue, but the Attorney General was construing the provisions relevant to private schools—just what defendants are arguing for here. It does not make sense that the Court of Appeals itself, albeit unknowingly, applied the private and parochial schools act criteria in order to say that defendants have no school, and then told defendants that because they were not a school, they were not entitled to the act's hearing provision. In fact, they are a school until a hearing produces a determination to the contrary.

The state's argument makes the same mistake.[52] The state argues that the provisions of the private and parochial schools act are not the concern of

[51] In essence, the Court of Appeals ignored the hearing requirement and made the finding of noncompliance that should have been made at the hearing.

[52] Like defendants, see n 40, the state discusses factually whether defendants complied with the private and parochial schools act. However, for the reasons stated previously, we need not address this argument.

the prosecutor. Rather, the state argued, the prosecutor was only interested in prosecuting parents who failed to send their children to school.[53] Closing a home school for failing to comply with the private and parochial schools act, although in effect what the defendants' prosecution resulted in, was not the prosecutor's concern. But the prosecutor argued that defendants were not sending their children to school because the "school" to which the parents sent their children, inter alia, did not utilize a certified teacher or provide comparable curricula. Again, these are the same criteria the state uses to close nonpublic schools under the private and parochial schools act. Even though he does not realize it, the prosecutor is concerned with the act's provisions because, if he has been informed that the provisions were not complied with, he can prosecute home-school parents for failing to send their children to school. It is only fair, then, that if defendants are required to comply with the act's provisions, they should also be entitled to the act's hearing requirement.

IV

We conclude that the Fourteenth Amendment does not provide parents a *fundamental* right to direct their children's secular education, and, thus, the state regulation need only be judged by a rational relationship test. We further conclude that the defendants have not met the burden of establishing that teacher certification is not rea-

[53] In its amicus curiae brief, the Board of Education notes that confusion arises in the construction of the two statutes because in home-school situations the same parties are both the parents prosecuted for failing to send their children to school and the private school administrators not complying with the private and parochial schools act. This "coincidence," the board argues, does not merge the two statutes. Rather, the board urges this Court to consider the two statutes completely independently of each other.

sonably related to the state's legitimate interest. Moreover, defendants were entitled, under the statute, as administrators of a private home school, to the hearing provided by the private and parochial schools act before they could be prosecuted as parents who failed to send their children to school in violation of the compulsory education laws.

For the foregoing reasons, the defendants' convictions for failing to send their children to school in violation of the compulsory education laws are vacated.

Griffin and Mallett, JJ., concurred with Brickley, J.

Levin, J. (*concurring*). I join in the vacation of the convictions because I agree with the majority that the Bennetts were entitled, under the statute, to a hearing before they would be subject to prosecution for failure to send their children to school.

Cavanagh, C.J., concurred with Levin, J.

Boyle, J. (*concurring in part and dissenting in part*). I concur in Justice Brickley's reasoning and result in parts I and II of his opinion. I respectfully disagree with part III. The statutes in question, MCL 388.554; MSA 15.1924 (the private school act) and MCL 380.1599; MSA 15.41599 (the School Code) have different purposes and distinct remedies. The administrative hearing required by the private school act applies to the operator of a school and is administered by the Department of Education. The department has no statutory role in the enforcement of the compulsory education law, which is administered by the local school districts and the prosecuting attorney, and is di-

rected to the responsibility of persons in parental relation with school-age children. I would affirm the decision of the Court of Appeals.

RILEY, J. (*concurring in part and dissenting in part*). I agree with the majority regarding the issue resolved in part III and join that holding. Yet, I would hold that MCL 388.553; MSA 15.1923 unconstitutionally abridges defendants' right to direct the education of their children because it is an unreasonable regulation unrelated to the educational achievement of their children schooled at home. Therefore, I respectfully dissent from the Court's holding in part II.

I

As noted by the majority, defendants John and Sandra Bennett taught their children, Scott, Erika, Krista, and Jason, at home in coöperation with Clonlara, Inc.'s home based education program. *Ante* at 321. The Bennetts' performance as teachers is not criticized by the state, only their failure to utilize certified instructors. Indeed, any state contention that the Bennetts inadequately instructed their children would be unwarranted because the Bennetts appear to be at least as effectual educators as the local public school district. In fact, the majority recognizes that Jason's educational achievement was at least satisfactory, while Erika's and Krista's were superior for their grade levels. *Ante* at 322, n 6. The excellence of the Bennetts' teaching, however, was most cogently demonstrated by the educational improvement of Scott: he had fallen below grade level in public school, but under his parent's instruction he steadily progressed and met the goals of his grade level. *Id.* Nevertheless, the state prosecuted and convicted the Bennetts for failing to utilize certified teachers.

II

As in all constitutional jurisprudence, an examination of the history and rationale underlying the right to educate one's children is necessary to obtain the proper insight vital to the proper resolution of the instant case. *Committee for Constitutional Reform v Secretary of State,* 425 Mich 336, 340-342; 389 NW2d 430 (1986); *Lockwood v Comm'r of Revenue,* 357 Mich 517, 556-558; 98 NW2d 753 (1959).

A

American jurisprudence has historically recognized "Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham v J R,* 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d 101 (1979).[1] Indeed, "[t]his primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v Yoder,* 406 US 205, 232; 92 S Ct 1526; 32 L Ed 2d 15 (1972). Society's historical deference toward parental responsibility regarding their children has been in part motivated by the "presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," as well as the recognition that "bonds of affection lead parents to act in the best interests of their children." *Parham, supra* at 602. Perhaps most important, this well-established protection of the "sanctity of the family" has occurred "precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through

---

[1] The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. [*Wisconsin v Yoder,* 406 US 205, 232; 92 S Ct 1526; 32 L Ed 2d 15 (1972).]

the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore v East Cleveland,* 431 US 494, 503-504; 97 S Ct 1932; 52 L Ed 2d 531 (1977) (Powell, J.).[2] "Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter." *Bellotti v Baird,* 443 US 622, 638; 99 S Ct 3035; 61 L Ed 2d 797 (1979) (Powell, J.).[3] The Supreme Court, therefore, has "consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v New York,* 390 US 629, 639; 88 S Ct 1274; 20 L Ed 2d 195 (1968). Accordingly, the Liberty Clause of the Fourteenth Amendment of the United States Constitution,

[2] Professor Hafen elaborates:

[T]he cultural patterns of American family life have contributed enormously to the ultimate purposes of a democratic society by providing the stability and the structure that are essential to sustaining individual liberty over the long term. . . . Only in the master-apprentice relationship of parent and child, committed to one another by the bonds of kinship, can the skills, normative standards, and virtues that maintain our cultural bedrock be transmitted. [Hafen, *The constitutional status of marriage, kinship, and sexual privacy—Balancing the individual and social interests,* 81 Mich L R 463, 473, 478 (1983).]

[3] Professor Hafen explains that not only is family autonomy essential to the transmission of republican values, but that it is a strong hedge against tyranny:

Monolithic control of the value transmission system is "a hallmark of totalitarianism," thus, "for obvious reasons, the state nursery is the paradigm for a totalitarian society." An essential element in maintaining a system of limited government is to deny state control over childrearing, simply because childrearing has such power. Even if the system remains democratic, massive state involvement with childrearing would invest the government "with the capacity to influence powerfully, through socialization, the future outcomes of democratic political processes." [Hafen, n 2 *supra* at 480-481. Citations omitted.]

which proclaims that "[n]o state shall . . . deprive any person of . . . liberty . . . without due process of law,"[4] has long been understood to protect the right "to marry [and] establish a home and bring up children . . . ." *Meyer v Nebraska,* 262 US 390, 399; 43 S Ct 625; 67 L Ed 1042 (1923).[5]

An essential corollary of the right to establish a

---

[4] A similar provision in the Michigan Constitution also protects due process of law:

> No person shall be . . . deprived of life, liberty or property, without due process of law. [Const 1963, art 1, § 17.]

Moreover, authorities have found that the First Amendment, *Griswold v Connecticut,* 381 US 479, 488; 85 S Ct 1678; 14 L Ed 2d 510 (1965), and the Ninth Amendment, *id.* at 488-490 (Goldberg, J.), also protect the right to direct the education of one's children. Michigan has corresponding constitutional guarantees. Const 1963, art 1, §§ 4-5 (protecting the freedoms of speech, press, as well as religious liberty); Const 1963, art 1, § 23 (protecting unenumerated rights).

Whether the Michigan Constitution affords greater protection of parental interests than the United States Constitution was not at issue in the instant case.

[5] The Court has frequently emphasized the importance of the family. The rights to conceive and raise one's children have been deemed "essential," *Meyer* [*supra* at] 399 . . . , "basic civil rights of man," *Skinner v Oklahoma,* 316 US 535, 541 [62 S Ct 1110; 86 L Ed 1655] (1942), and "[r]ights far more precious . . . than property rights," *May v Anderson,* 345 US 528, 533 [73 S Ct 840; 97 L Ed 1221] (1953). [*Stanley v Illinois,* 405 US 645, 651; 92 S Ct 1208; 31 L Ed 2d 551 (1972). See also *Cleveland Bd of Ed v LaFleur,* 414 US 632, 639-640; 94 S Ct 791; 39 L Ed 2d 52 (1974); *Prince v Massachusetts,* 321 US 158, 166; 64 S Ct 438; 88 L Ed 645 (1944); *Moore, supra* at 499.]

Because of this historical recognition of the family as "perhaps the most fundamental social institution of our society," *Trimble v Gordon,* 430 US 762, 769; 97 S Ct 1459; 52 L Ed 2d 31 (1977), "[w]hen the Court in 1923 first recognized that the right of parents to direct the upbringing of their children was part of the substantive liberty protected by the due process clause, it did not create a new legal right out of whole constitutional cloth. It merely acknowledged in constitutional language the traditions of Status and the civil legislation that predated the Constitution. In that sense, *Meyer v Nebraska* is a clear example of substantive due process as a search only for 'fundamental principles as they have been understood by the traditions of our people and our law.'" Hafen, n 2 *supra* at 572, quoting *Lochner v New York,* 198 US 45, 76; 25 S Ct 539; 49 L Ed 937 (1905) (Holmes, J., dissenting).

home and raise children is the "liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v Society of Sisters,* 268 US 510, 534-535; 45 S Ct 571; 69 L Ed 1070 (1925).[6] Traditionally, American jurisprudence had "recognized that parents were solely responsible for the education of their children." Lotzer, *Texas homeschooling: An unresolved conflict between parents and educators,* 39 Baylor L R 469, 475 (1987).[7] Hence, "our constitutional system long ago rejected any notion that a child is 'the mere creature of the State' and, on the contrary, asserted that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'" *Parham, supra* at 602, quoting *Pierce, supra* at 535.

**B**

The right, of course, is not absolute. *Pierce, supra* at 534.[8] This is true because "[c]orresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life . . . ." *Meyer, supra* at 400.[9] Hence, the state's substantial interest in education may, at times, override parents' liberty interests.

[6] See also *Employment Div, Dep't of Human Resources v Smith,* 494 US 872, 881; 110 S Ct 1595; 108 L Ed 2d 876 (1990); *Yoder, supra; Griswold,* n 4 *supra* at 482-483; *Farrington v Tokushige,* 273 US 284, 298; 47 S Ct 406; 71 L Ed 646 (1927); *Meyer, supra* at 399-400.

[7] See also, e.g., *Gordon v Los Angeles Bd of Ed,* 78 Cal App 2d 464, 480; 178 P2d 488 (1947); *School Bd Dist No 18 v Thompson,* 24 Okla 1, 4; 103 P 578 (1909); *Rulison v Post,* 79 Ill 567, 573 (1875).

[8]  While the parents contend, and we agree, that they possess a basic right in directing the education of their children, such a right is not absolute but must be reconciled with the substantial State interest in the education of its citizenry. [*Care and Protection of Charles,* 399 Mass 324, 336; 504 NE2d 592 (1987).]

[9] See also *Lehr v Robertson,* 463 US 248, 257; 103 S Ct 2985; 77 L Ed 2d 614 (1983) (parental interest in the upbringing of their children is "a counterpart of the responsibilities they have assumed").

*Prince v Massachusetts,* 321 US 158, 166; 64 S Ct
438; 88 L Ed 645 (1944) ("[a]cting to guard the
general interest in youth's well being, the state as
*parens patriae* may restrict the parent's control by
requiring school attendance"). On the other hand,
the Supreme Court has not hesitated to strike
down laws imposing on individuals' rights to direct
their children's education when they are not rea-
sonably related to legitimate educational goals.
See, e.g., *Pierce, supra* at 534-535.[10]

[10] Whether this liberty is fundamental, and therefore deserving of
the most heightened constitutional protection, or is of lesser impor-
tance, thereby deserving a more deferential standard of protection,
was energetically disputed by the parties.

The majority has found that parents do not possess a fundamental
right to direct the education of their children deserving of strict
scrutiny, but merely possess a right protected by a reasonable basis
standard. *Some recent United States Supreme Court dicta support
this proposition.* See, e.g., *Runyon v McCrary,* 427 US 160, 178-179; 96
S Ct 2586; 49 L Ed 2d 415 (1975) ("[t]he Court has repeatedly stressed
that . . . [parents] have no constitutional right to provide their
children with private school education unfettered by reasonable gov-
ernment regulation"). Hence, some courts relying on that and earlier
Supreme Court language have applied a reasonableness test. See, e.g.,
*Hanson v Cushman,* 490 F Supp 109, 114-115 (WD Mich, 1980)
(applying a reasonableness standard in upholding Michigan's teacher
certification requirement as applied to home schools).

Yet, reliance on this dicta may be unwarranted because they
appear to stem from the confusion arising from applying Supreme
Court pronouncements of the 1920s and 1930s in modern cases.
Earlier this century, the Supreme Court had yet to develop the
varying degrees of scrutiny ubiquitously applied in the modern era.
The recognition of a constitutional right did not necessarily result in
a clear specification of the particular degree of scrutiny to be applied.
In fact, the Court not only explicitly recognized *"fundamental* rights
of the individual which [*Meyer, supra; Bartels v Iowa,* 262 US 404; 43
S Ct 628; 67 L Ed 1047 (1923); *Pierce, supra*] declared," *Farrington,* n
6 *supra* at 299 (emphasis added), but at the same time articulated a
reasonableness standard. *Id.* at 298. See also *Pierce, supra* at 534 and
*Meyer, supra* at 399-401 (recognizing fundamental parental rights,
while utilizing a reasonableness standard). Adding to the confusion
was the Court's practice to articulate a reasonableness standard,
while the application of that standard often left no doubt that much
stronger scrutiny was to be applied. See, e.g., *Lochner,* n 5 *supra* at 58
(striking down a maximum hour law for bakeries because there was
"no reasonable foundation for holding [it] to be necessary or appropri-
ate as a health law"). Later, the Supreme Court differentiated be-
tween constitutional rights, applying a low standard of review (now
articulated as a reasonableness or rational basis test) to disfavored

rights, while applying heightened review (now articulated as strict scrutiny) to "fundamental rights."

As noted, the modern Supreme Court has cited the earlier Court opinions without much elaboration. Hence, modern Supreme Court dicta also support the proposition that the right to educate one's children is deserving of strict scrutiny. See, e.g., *Smith,* n 6 *supra* at 881 (equating the "right of parents . . . to direct the education of their children" with "freedom of speech and of the press"); *Kelley v Johnson,* 425 US 238, 244; 96 S Ct 1440; 47 L Ed 2d 708 (1976) (equating the liberty protected in *Meyer, supra,* with the liberties protected in *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 [1973] [right of abortion], *Eisenstadt v Baird,* 405 US 438; 92 S Ct 1029; 31 L Ed 2d 349 [1972] [right to obtain contraceptives], *Stanley,* n 5 *supra* [right of an unwed father to retain custody of children], and *Griswold,* n 4 *supra* [right of married couples to use contraceptives]); *id.* at 482 (referring to the right to direct the education of one's children as if it were fundamental); *id.* at 498 (Goldberg, J.) (noting that the rights recognized in *Pierce* and *Meyer* are fundamental). Not surprisingly, some modern authorities have concluded that the right of parents to direct the education of their children is fundamental. See, e.g., *Dep't of Social Services v Emmanual Baptist Preschool,* 434 Mich 380, 416; 455 NW2d 1 (1990) (CAVANAGH, J.) and *Sheridan Rd Baptist Church v Dep't of Ed,* 426 Mich 462, 536-540; 396 NW2d 373 (1986) (RILEY, J.), cert den 481 US 1050 (1987) (finding the right to direct the education of one's children to be a fundamental right); *Ohio v Whisner,* 47 Ohio St 2d 181, 214; 351 NE2d 750 (1976) ("it has long been recognized that the right of a parent to guide the education, including the religious education, of his or her children is indeed a 'fundamental right' guaranteed by the due process clause of the Fourteenth Amendment"); Hafen, n 2 *supra* at 548 (concluding that the right to direct the education of one's children is "almost beyond the reach of legislative regulation" and that "most of the Court's opinions recognizing constitutional rights in the adjudication of family interests have subjected the legislation involved to more than minimal scrutiny").

In any event, the divergent holdings arise because "[t]he Supreme Court has never addressed directly the full range of parental autonomy questions presented by the home education movement," Lupu, *Home education, religious liberty, and the separation of powers,* 67 B U L R 971, 975 (1987), but in fact "has continued to do its best to avoid the development of a consistent and understandable test for its family-related cases," Hafen, n 2 *supra* at 468, n 15.

Because of the historical recognition of the vital importance of the autonomy of the family, I am inclined to apply strict scrutiny in the private and home school context (as a government-provided benefit and subsidization of a right, public schools need not be subjected to such scrutiny, *Rust v Sullivan,* 500 US 173; 111 S Ct 1759; 114 L Ed 2d 233 [1991]). Nevertheless, I do not rest this opinion upon such an analysis, but apply the reasonableness standard because I find that the requirement is not reasonably related to education, thereby negating the necessity of determining whether the higher standard of review is applicable.

III

The teacher certification requirement, as applied to the Bennetts' home school, violates their constitutionally protected liberty to direct the education of their children because it is not reasonably related to education.

A

The state correctly maintains that it possesses a legitimate interest in ensuring the adequate education of all children. *Brown v Bd of Ed,* 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954). Indeed, the importance of compulsory education parallels that of family autonomy—both "prepare citizens to participate effectively and intelligently in our open political system," which is an indispensable prerequisite to the preservation of our democratic republic. *Yoder, supra* at 221. Similarly, both ready our youth "to be self-reliant and self-sufficient participants in society." *Id.* at 221. Again, like the family, our commitment to education is deeply rooted in our history: "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer, supra* at 400.

Nevertheless, a careful examination of the state interest in the instant case reveals that it is not compulsory education per se, but the manner of education:

> [T]he state's interest is simply the certification requirement of the private school act, not the general objectives of compulsory education. The interest the state pursues is the manner of education, not its goals. [*People v DeJonge (After Remand),* 442 Mich 266, 290; 501 NW2d 127 (1993)].

See also *Care and Protection of Charles,* 399 Mass 324, 336; 504 NE2d 592 (1987); *Ohio v Whisner,* 47

Ohio St 2d 181, 216-217; 351 NE2d 750 (1976).
Hence, the state possesses a legitimate interest in
the manner of education only as long as it is
reasonably related to educational achievement.
*Pierce, supra* at 534-535.

B

The crux of the instant case is not "the legiti-
macy of the state ends," but "rather, to determine
whether the means used to achieve these ends are
constitutionally defensible." *Stanley v Illinois,* 405
US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972).
Although deferential, the reasonableness standard
"is not a toothless one . . . ." *Mathews v Lucas,*
427 US 495, 510; 96 S Ct 2755; 49 L Ed 2d 651
(1976).[11] For instance, in *Pierce,* the Court declared
unconstitutional a state law prohibiting private
school education and compelling all children to
attend public schools. The Court first noted that
the parents and private educators

> engaged in a kind of undertaking not inherently
> harmful, but long regarded as useful and meritori-
> ous. Certainly there is nothing in the present
> records to indicate that they have failed to dis-
> charge their obligations to patrons, students or the
> State. And there are no peculiar circumstances or
> present emergencies which demand extraordinary
> measures relative to primary education. [*Id.* at
> 534.]

Hence, the Court held the statute unconstitu-
tional because it

> unreasonably interferes with the liberty of parents
> and guardians to direct the upbringing and educa-
> tion of children under their control. . . . The fun-

[11] Although *Mathews,* applies the standard with regard to the
rational basis test of equal protection, there is no difference in its
application with regard to due process.

damental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. [*Id.* at 534-535.]

Utilizing parallel reasoning, courts have also struck down prohibitions of foreign language instruction, *Farrington v Tokushige,* 273 US 284, 298; 47 S Ct 406; 71 L Ed 646 (1927); *Bartels v Iowa,* 262 US 404, 411; 43 S Ct 628; 67 L Ed 1047 (1923); *Meyer, supra* at 403; as well as comprehensive standards so regulating private instruction that meaningful distinctions between public and private schools had been eliminated, *Whisner, supra* at 216-223.

Similarly, Michigan's teacher certification requirement is not reasonably related to educational achievement, but is merely an attempt to standardize its children by forcing students to accept instruction only from state-approved teachers. Although the Court of Appeals found that "[t]he teacher certification requirement is a backbone in the protection of "[12] state education, this contention is dubitable in the instant case. There is no dispute that the Bennett children are receiving an excellent education from their parents. Nor does the state argue that the Bennetts' education of their children is not "meritorious" or poses "peculiar circumstances or present[s] emergencies which demand extraordinary measures relative to primary education." Moreover, as recognized by this Court in *DeJonge,* the nearly universal consensus of our sister states is to authorize home schools without teacher certification.[13] In fact, even Michi-

[12] *People v DeJonge (On Rehearing),* 179 Mich App 225, 236; 449 NW2d 899 (1989).

[13] Besides Michigan, only two states, California and Alabama, appear to require teacher certification in home schools. Cal Ed Code 48224; Ala Code 16-28-1. Moreover, "many of our sister states have much less stringent supervisory control over home schooling than does Michigan." *DeJonge* at 293, n 50. For a thorough discussion of

gan does not mandate that all students be taught by certified teachers.[14] Furthermore, the state failed to provide any evidence proving a correlation between the teacher certification requirement and educational achievement,[15] while the Bennetts have proven that their children have been adequately educated without certified teachers. Not unlike prohibiting foreign language instruction or private education, mandatory teacher certification in this home school is simply irrelevant to educational achievement.

The teacher certification requirement, therefore, is unconstitutional in the instant case because it "has but a tenuous relation to alleviation" of the state's purported interest. *Moore, supra* at 500 (Powell, J.).[16] Although the state possesses a legitimate interest in ensuring the adequate education of the Bennett children, it has failed to support the proposition that the certification requirement is reasonably related to that interest. Indeed, forcing the Bennetts to halt the education of their children merely "spites [the state's] own articulated goals . . . ." *Stanley, supra* at 653. Instead, the teacher certification requirement attempts to standardize the education of the Bennett children to state-imposed dictates in derogation of parents' constitutional rights. *Pierce, supra* at 534.[17]

our sister states' practices, as well as the actual practice of Michigan, see *DeJonge* at 292-296.

[14] *DeJonge* at 296.

[15] See *DeJonge* at 294-298.

[16] *Murphy v Arkansas,* 852 F2d 1039, 1042-1043 (CA 8, 1988) (finding that a state requirement that home schooling be accompanied by standardized achievement testing to be the least restrictive means, thereby implicitly recognizing that teacher certification is not the least restrictive means). Cf. *Whisner, supra* at 216-218 (striking down comprehensive school regulations as violating the right to direct the education of one's children, as well as the free exercise of religion).

[17] The majority's analysis is unconvincing and contrary to long-established Supreme Court authority. Although the majority purports to find that the teacher certification requirement is valid because it satisfies the "minimal scrutiny test," *ante* at 336, in fact it applies no scrutiny at all. The majority, for instance, discards defendants' argu-

IV

I would hold that MCL 388.553; MSA 15.1923 unconstitutionally abridges defendants' right to direct the education of their children because it is an unreasonable regulation unrelated to the educational achievement of their children schooled at home. Therefore, I respectfully dissent from the Court's holding in part II.

ments without carefully examining the factual record, and then claims that defendants failed to meet their burden of proof. The United States Supreme Court, on the other hand, carefully examines the state interest, the means the state utilizes to reach those ends, and the effectiveness of the parents' instruction when examining state regulation of parents' liberty to educate their children. *Pierce, supra* at 534-535; *Farrington, supra* at 298. If the means the state undertakes to meet a legitimate interest are unrelated to the interest it is attempting to further, the statute violates the liberty to direct the education of one's children. See, e.g., *Pierce, supra* at 534-535. Extending the majority's reasoning to its logical conclusions, however, a prohibition of private education would almost certainly be found to be reasonably related to educational achievement because that assertion is " 'at least debatable.' " *Ante* at 338 (citation omitted). Yet, the Supreme Court rejected such reasoning and declared those laws unconstitutional. *Pierce, supra* at 534-535. Similarly, the rationale of the majority would most likely find a state's prohibition of foreign language instruction to be reasonable because parents could not disprove a state's assertion that foreign language instruction threatens national security. Again, the Supreme Court has struck down such statutes. See, e.g., *Farrington, supra* at 298.

*Pierce, Farrington,* and their progeny are indistinguishable from the instant case. In each case the state asserted an interest that may have facially appeared reasonable, but that was disputed by the available evidence. Defendants have met their burden by showing that they adequately educate their children and that the state's certification requirement is unrelated to educational achievement in home schools.