## CLONLARA, INC v STATE BOARD OF EDUCATION

Docket No. 91372. Argued November 10, 1992 (Calendar No. 3). Decided May 25, 1993.

Clonlara, Inc., a private, nonreligious school offering curriculum and administrative assistance through its home based education program to parents who educate their children at home, and Deborah McConnell, a parent who does not have a teaching certificate and who educates her children at home with the aid of Clonlara, brought an action in the Ingham Circuit Court against the State Board of Education and others, seeking declaratory and injunctive relief from enforcement of the Department of Education's Nonpublic School and Home School compliance procedures. The plaintiffs alleged that the procedures are invalid because they were not promulgated in accordance with the Administrative Procedures Act, MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.*, that they subject home school parents to prosecution under the compulsory attendance law without providing an administrative hearing required by the nonpublic school act, and that they are void for vagueness. The court, Thomas L. Brown, J., issued a preliminary injunction requiring the department to modify its information-gathering membership form, but did not enjoin the use of the compliance procedures. After a hearing, the court found that instruction for home school pupils must be provided by certified teachers, that home school pupils need not receive 180 days of instruction, that social studies and science need not be taught, and that the department could not interpret the term "instruction" used in the nonpublic school act because the Legislature did not define it. The Court of Appeals, CAVANAGH, P.J., and JANSEN and T. J. LESINSKI, JJ., affirmed, holding the compliance procedures void because they were rules that had not been promulgated in accordance with the Administrative Procedures Act (Docket No. 116372). The defendants appeal.

In an opinion by Justice LEVIN, joined by Chief Justice

REFERENCES

Am Jur 2d, Administrative Law § 95, 201-208, 233-255.
See ALR Index under Administrative Law.

CAVANAGH, and Justices BRICKLEY, BOYLE, and MALLETT, the Supreme Court *held:*

The Department of Education's Nonpublic School and Home School compliance procedures are not rules, and therefore are not invalid because they were not promulgated pursuant to the Administrative Procedures Act rule-making requirements. Rather, they are interpretive statements that do not have the force of law.

1. An agency's authority to adopt rules is provided in the statute creating the agency and vesting it with certain powers and also may be inferred from other statutory authority. Rules adopted by an agency in accordance with the APA have the force and effect of law; however, where the agency has not been empowered to promulgate rules, policy statements issued by it, so-called interpretive rules, need not be promulgated in accordance with the APA and do not have the force of law.

2. Agencies may interpret the statutes that they are bound to administer and enforce. Legislative rules have the force of law and are enforceable in and of themselves. Interpretive rules state an agency's interpretation of a statute, but an agency must rely on the underlying statute to support its interpretation. In this case, the compliance procedures state in what circumstances the Department of Education will consider a home school to be in violation of the nonpublic school act. The process of deciding when a violation has occurred necessarily involves interpretation of the nonpublic school act. Thus, setting guidelines concerning when the department will seek to enforce the act is not the same as promulgating legislative rules.

3. An interpretive statement that goes beyond the scope of the law may be challenged when it is in issue in a judicial proceeding. An interpretation not supported by the enabling act is an invalid interpretation, not a rule. Communication to the public does not convert an interpretive statement into an independently enforceable rule; rather, informing the public is one of the purposes of interpretive rules. In this case, the compliance procedures do not create or destroy rights. A home school student may ignore the compliance procedures at the risk of having the department seek a hearing at which the underlying statute and not the department's interpretation would control. The department then must show violation of the statute, not violation of the interpretive rule.

4. An invalid interpretation cannot become an invalid rule unless the agency is empowered to promulgate rules. Because the Department of Education is not authorized, explicitly or

implicitly, to promulgate rules relating to the nonpublic school act, its action in requiring a 180-day school year cannot have the effect of an invalid rule.

5. Home schools are covered by the nonpublic school act because they are schools other than a public school. As such, they are required to provide instruction by a teacher who would be qualified to teach in the public schools, and because the School Code requires that all teaching in public schools be done by certified teachers, and the nonpublic school act mandates that nonpublic schools meet the same standards, all hours of instruction in home schools must be conducted by certified teachers. There is no statutory basis for requiring that home schools have a minimum term of 180 days; however, requiring home schools to teach social studies and science are valid interpretations of the relevant statutory provisions.

Affirmed in part and reversed in part.

Justice RILEY, joined by Justice GRIFFIN, concurring in part and dissenting in part, stated that the 180-day requirement is an invalid rule promulgated in violation of the APA. An administrative rule is valid only if it is within the power granted an agency, is issued pursuant to proper procedure, and is reasonable. If a rule does not comply with the procedural requirements of the APA it is invalid; an agency policy adopted without complying with APA procedures and that has the effect of a rule is an invalidly promulgated rule.

In this case, the 180-day procedure meets the basic definition of a rule under the APA and has a binding effect: The agency acted as if the procedure were binding, it was mailed to all known home schools and directed the recipients to return an information form that required adherence, the agency enforced the procedure and directed intermediate school districts to enforce it as law, and the recipients undoubtedly understood it to be binding because it declared that it was authorized and defined by the law. The requirement does not fall within the APA's exceptions because it contradicts the nonpublic school act, which does not mandate 180 days of instruction. Although the board recognized that the procedure was not legally binding, its actions practically bound home schools in violation of the APA. Regardless of the labels placed on the procedure, the board possessed no power to dictate a 180-day requirement.

188 Mich App 332; 469 NW2d 66 (1991) affirmed in part and reversed in part.

1. SCHOOLS — HOME SCHOOLS — DEPARTMENT OF EDUCATION — COMPLIANCE PROCEDURES.
The Department of Education's Nonpublic School and Home

School compliance procedures are not rules, and therefore are not invalid because they were not promulgated pursuant to the Administrative Procedures Act rule-making requirements; rather, they are interpretive statements that do not have the force of law.

2. ADMINISTRATIVE LAW — ADMINISTRATIVE PROCEDURES ACT — INTERPRETIVE RULES.

An agency's authority to adopt rules is provided in the statute creating the agency and vesting it with certain powers and also may be inferred from other statutory authority; rules adopted by an agency in accordance with the Administrative Procedures Act have the force and effect of law; however, where the agency has not been empowered to promulgate rules, policy statements issued by it, which amount to interpretive rules, need not be promulgated in accordance with the act and do not have the force of law (MCL 24.201 *et seq.*; MSA 15.1921 *et seq.*).

3. ADMINISTRATIVE LAW — AGENCY — INTERPRETIVE STATEMENTS — ENABLING ACT.

An interpretive statement by an agency that goes beyond the scope of an enabling act may be challenged when it is in issue in a judicial proceeding; if not supported by the act it is an invalid interpretation; communication to the public does not convert an interpretive statement into an independently enforceable rule; rather, informing the public is one of the purposes of interpretive rules.

*Kurt Berggren* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Paul J. Zimmer* and *Jane D. Woodfin,* Assistant Attorneys General, for the defendants.

LEVIN, J. The question presented is whether nonpublic school and home school compliance procedures, published in October, 1986, by the Department of Education pursuant to the nonpublic school act,[1] the compulsory school attendance act,[2]

---

[1] 1921 PA 302, MCL 388.551 *et seq.*; MSA 15.1921 *et seq.*

[2] School Code; MCL 380.1561 *et seq.*; MSA 15.41561 *et seq.*

and the intermediate school districts act,[3] are invalid because they were not promulgated in accordance with the procedures requisite to rule making set forth in the Administrative Procedures Act.[4] We hold that the compliance procedures are not rules, and therefore are not invalid because they were not promulgated pursuant to the APA rule-making requirements. They are interpretive statements that do not have the force of law.[5]

I

Clonlara, Inc., and Deborah McConnell commenced this action, seeking declaratory and injunctive relief barring the State Board of Education and the Department of Education[6] from enforcing the compliance procedures.

Clonlara and McConnell claimed that the compliance procedures constitute rules and are invalid because they were not promulgated in accordance with the APA, that the compliance procedures subject home school parents to prosecution under the compulsory attendance law[7] without providing an administrative hearing required by the nonpublic school act,[8] and that the compliance procedures are void for vagueness.

Clonlara is a private, nonreligious school that applies an alternate philosophy in the education of

---

[3] School Code; MCL 380.653; MSA 15.4653.

[4] 1969 PA 306, MCL 24.201 et seq.; MSA 3.560(101). et seq. See chapter 3, Procedures for Processing and Publishing Rules, MCL 24.231 et seq.; MSA 3.560(131) et seq.

[5] The Administrative Procedures Act provides that an "interpretive statement" that in itself does not have the "force and effect of law but is merely explanatory," is not a rule. MCL 24.207(h); MSA 3.560(107)(h).

[6] Phillip E. Runkel, Superintendent of Public Instruction, is also a defendant.

[7] MCL 380.1561 et seq.; MSA 15.41561 et seq.

[8] MCL 388.554 et seq.; MSA 15.1924 et seq.

children. In addition to its campus program based in Ann Arbor, Clonlara offers curriculum and administrative assistance through its home based education program to parents who have chosen to educate their children at home.

Approximately five hundred families, including McConnell's family, have contracted for Clonlara's home school services. Since September, 1984, McConnell has educated her three school-age children at home with the aid of Clonlara.[9] The McConnell children receive substantially all their educational instruction from their mother at home, occasionally attending classes at the Clonlara campus. McConnell has a high school education, but does not have a teaching certificate or permit to teach either in elementary or secondary school.

During the six-month period preceding the February, 1989, hearing in the circuit court, the McConnell children attended approximately twelve hours of classes with certified teachers during eight visits to Clonlara. McConnell estimated that her children were in communication with certified teachers an average of 1.5 hours per day. This included telephone conversations with certified teachers at Clonlara and telephone and personal communication with three certified teachers who taught their children at home.[10]

The compliance procedures were not promulgated in accordance with the APA rule-making requirements. The compliance procedures concern the collection and processing of information respecting the exercise of the department's supervisory authority under the nonpublic school act. The circumstances in which the department may insti-

[9] When the trial began in February 1989, Daniel was fifteen, Tamara was thirteen, and Gene David was twelve.

[10] It is unclear whether McConnell included use of educational audio- and videotapes and a computer in her estimate.

tute enforcement proceedings for noncompliance with the provisions of the nonpublic school act are stated.[11] The compliance procedures also state that a home school shall provide instruction:

—by a certified teacher;
—in social studies and science classes;
—during a school year lasting at least 180 days.

The circuit judge issued a preliminary injunction that required the department to modify its information-gathering membership report form, but did not enjoin use of the compliance procedures.

After a hearing, the judge ruled that the compliance procedures were vague and arbitrary and "so shot through with problems" that it was impossible to separate those procedures that met legal requirements and standards set forth by law, and those that did not. He said that instruction of home school pupils must be provided by certified teachers, but concluded that (1) home school pupils need not receive 180 days of instruction each school year, (2) the course of study to be taught in home schools need not include social studies and science, and (3) the department could not interpret the term "instruction" as used in the nonpublic school act, because the Legislature did not define it.

The Court of Appeals affirmed on different grounds.[12] The Court held that the compliance

[11] Section 4, MCL 388.554; MSA 15.1924, provides that the superintendent of public instruction, upon discovering a violation of the act, shall serve notice with a complaint upon the parents and hold a hearing. If a violation is found and the parents do not remedy it within an appropriate amount of time, the children may be compelled to attend public school under the compulsory attendance law. See n 7.

[12] 188 Mich App 332; 469 NW2d 66 (1991).

procedures were rules that had not been promulgated in accordance with the APA and were therefore void. The Court said that the compliance procedures were rules because they "prescribe the procedures involved in applying the law enforced or administered by the school agency."[13]

## II

It has been said that "[a]n agency's authority to adopt rules is typically provided for in the statute creating the agency and vesting it with certain powers," and that "[r]ulemaking authority may also be inferred from other statutory authority granted to an agency."[14] Bienenfeld, Michigan Administrative Law (2d ed), ch 4, pp 18, 19. This Court has said that "what is essential to a valid . . . Michigan 'rule' is: a reasonable exercise of *legislatively* delegated power, pursuant to proper procedure."[15]

In February, 1986, an assistant attorney general wrote the Superintendent of Public Instruction in response to his inquiry whether the Department of Education has the authority to promulgate rules regulating home schools pursuant to the nonpublic school act. He observed that there is no express grant of rule-making authority in the act. He said that in the sixty-five years since its enactment, the department had not promulgated any rules pursuant to the nonpublic school act. He concluded that the department does not have the authority to promulgate rules regulating home schools pursuant to the nonpublic school act.

---

[13] *Id.,* p 337.

[14] Neither Clonlara nor McConnell claim that rule-making authority can be inferred from either the nonpublic school act or another statute.

[15] *Michigan Farm Bureau v Workmen's Compensation Bureau,* 408 Mich 141, 150; 289 NW2d 699 (1980).

In contrast with the nonpublic school act, the School Code authorizes the State Board of Education to promulgate rules in a number of areas.[16]

---

[16] The following are provisions of the School Code authorizing the State Board of Education to promulgate rules:

MCL 380.1172(1); MSA 15.41172(1). "The state board shall promulgate rules concerning personality tests, both projective and nonprojective types, administered to pupils in school districts of the state as school projects or as parts of the school programs."

MCL 380.1251(1); MSA 15.41251(1). "School psychological service is a related nonclassroom function and shall be operated under rules promulgated by the state board, which shall establish the educational and experience requirements for, and certify as qualified and issue certificates to, the personnel for the services."

MCL 380.1252; MSA 15.41252. Nursing services "shall be operated under rules promulgated by the state board which shall establish the certification requirements for registered nurses in the services."

MCL 380.1296; MSA 15.41296. Auxiliary services shall be provided under rules promulgated by the board. These "include health and nursing services and examinations; street crossing guard services; . . . teacher of speech and language services."

MCL 380.1301(2); MSA 15.41301(2). "A pregnant person who is under the compulsory school age may withdraw from a regular public school program in accordance with rules promulgated by the state board."

MCL 380.1301(4); MSA 15.41301(4). "The board shall promulgate rules to implement this section," providing that a pregnant person cannot be expelled because of pregnancy and the school boards or districts can provide alternative education programs for school-age, expectant mothers and their children.

MCL 380.1531(12); MSA 15.41531(12). "The state board shall promulgate rules for the implementation of" teacher certification and qualifications.

MCL 380.1703(1); MSA 15.41703(1). "Special education personnel shall meet the qualifications and requirements of the rules promulgated by the state board."

MCL 380.1703(2); MSA 15.41703(2). Special education curriculum, eligibility, review procedures regarding placement, class and program size, equipment quantity and quality, supplies and housing, adequacy of instructional methods and length and content of the school day "shall be in accordance with rules promulgated by the state board relative to special education programs and services."

MCL 380.1741; MSA 15.41741. "An intermediate school board operating or contracting for the operation of special education programs or services may carry pupils in membership in the same manner as a local school district and shall be entitled to its proportionate share of state school aid available for these programs. Membership shall be calculated on the basis provided in rules promulgated by the state board."

Rules adopted by an agency in accordance with the APA have the force and effect of law. They must be promulgated in accordance with the procedures set forth in the APA, and are not valid if those procedures are not followed.[17] Where, however, the agency has not been empowered to promulgate rules, policy statements issued by it need not be promulgated in accordance with APA procedures and do not have the force of law. Such statements are so-called "interpretive rules." As expressed by Professor Davis, "An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules."[18]

### III

The APA provides:

> "Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or recision thereof . . . .[19]

Specifically excluded from the definition of "rule" are:

> (g) An intergovernmental, interagency, or intra-

---

[17] The APA provides a means by which the public and the Legislature can participate in agency rule making through public hearings and approval by the joint committee on administrative rules with intervals between each process. The APA seeks to assure that the essentials of the legislative process are not lost when law-making functions, formerly performed by the Legislature, are delegated to an agency. See *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Services*, 431 Mich 172; 428 NW2d 335 (1988).

[18] 2 Davis, Administrative Law (2d ed), § 7:8, p 36 and also 1989 Supp, p 243.

[19] MCL 24.207; MSA 3.560(107).

agency memorandum, directive, or communication that does not affect the rights of, or procedures and practices available to, the public.

(h) A form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory.

\* \* \*

(j) A decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected.[20]

A

Agencies have the authority to interpret the statutes they are bound to administer and enforce.[21]

Legislative rules have the force of law. Interpretive "rules" state an agency's interpretation of a statute. Legislative rules are enforceable in and of themselves. But an agency must rely on the underlying statute to support its reading of a statute set forth in an interpretive "rule."

> Legislative rules are substantive rules that have the force and effect of law. These rules fill in the interstices of the statute and presumably carry out its intent in greater detail. A court may not substitute its judgment of the content of a legislative rule, but may only strike the rule if the agency lacked statutory authority to adopt it, the agency failed to follow proper procedure, or the rule is unreasonable. [Bienenfeld, *supra,* ch 4, p 18.]

> [I]nterpretive rules are, basically, those that

---

[20] *Id.*

[21] *Wayne Twp Metropolitan School Dist v Davila,* 969 F2d 485, 490 (CA 7, 1992).

interpret and apply the provisions of the statute
under which the agency operates. No sanction
attaches to the violation of an interpretive rule as
such; the sanction attaches to the violation of the
statute, which the rule merely interprets. . . .
They state the interpretation of ambiguous or
doubtful statutory language which will be followed
by the agency unless and until the statute is
otherwise authoritatively interpreted by the
courts.

\* \* \*

If the rule represents something more than the
agency's opinion as to what the statute requires—
if the legislature has delegated a measure of legis-
lative power to the agency, and has provided a
statutory sanction for violation of such rules as
the agency may adopt—then the rule may prop-
erly be described as legislative. [1 Cooper, State
Administrative Law, pp 174-175.]

B

The compliance procedures state in what cir-
cumstances the Department of Education will con-
sider a home school to be violative of the non-
public school act. The department is obliged to
hold a hearing when it contends that a home
school is in violation of the act's provisions.[22] The
process of deciding when a violation has occurred
necessarily involves interpretation of the non-
public school act. Thus, setting guidelines concern-
ing when the department will seek to enforce the
act is not the same as promulgating legislative
rules.

[22] Section 4, MCL 388.554; MSA 15.1924. In *People v Bennett (After
Remand)*, 442 Mich 316; 501 NW2d 106 (1993), a majority of the Court
today decides that persons conducting home schools are entitled to
such a hearing before they can be found to have violated the compul-
sory school act.

C

We agree with the Court of Appeals that the board erred in construing the nonpublic school act as requiring a 180-day school year, although for reasons other than those stated in the opinion of the Court of Appeals. We disagree with the Court of Appeals, however, concerning the "social studies and science"[23] course requirements. Those course requirements are valid. In *DeJonge*,[24] this Court holds that the teacher certification requirement is violative of the First Amendment when it interferes with a parent's Free Exercise rights. In *Bennett*,[25] a majority of the Court decides that the teacher certification requirement is not violative of substantive due process guaranteed by the Fourteenth Amendment.

IV

Clonlara and McConnell make a number of arguments that the compliance procedures are in fact legislative rules, despite the absence of statutorily delegated power to promulgate rules.

A

Clonlara and McConnell observe that the compliance procedures include a form that parents are required to fill out and return to their local school districts. The form is not in issue in this appeal. It is authorized by § 5 of the nonpublic school act, and was approved by this Court in *Sheridan Rd*

---

[23] Note 12 *supra,* p 339.

[24] *People v DeJonge (After Remand),* 442 Mich 266; 501 NW2d 127 (1993).

[25] *People v Bennett,* n 22 *supra.* The Court, in three opinions, vacates the defendants' convictions on the ground that they were entitled to a hearing under the nonpublic school act before they could be prosecuted for failing to send their children to school.

*Baptist Church v Dep't of Ed,* 426 Mich 462, 472, n 5; 396 NW2d 373 (1986), cert den 481 US 1050 (1987).

B

Clonlara and McConnell contend that the procedures go beyond the scope of the law and therefore are not interpretive statements under an exception set forth in § 7(g) of the APA. An interpretive statement that goes beyond the scope of the law may be challenged when it is in issue in a judicial proceeding. An interpretation not supported by the enabling act is an invalid interpretation, not a rule. Otherwise, "wrong" interpretive statements might become rules with the force of law on the false premise that they were promulgated in accordance with the APA procedures. "[B]ecause a reviewing court disagrees with an agency interpretation does not render it legislative."[26]

C

Clonlara and McConnell contend that the compliance procedures are not an intergovernmental, interagency, or intra-agency memorandum under exception § 7(g) because they were distributed to the public. Communication to the public does not convert an interpretive statement into an independently enforceable rule. Rather, informing the public is one of the purposes of interpretive "rules." "Interpretive rules are statements as to what the agency thinks a statute or regulation means; they are statements issued to *advise* the

[26] *Wayne Twp Metropolitan School Dist,* n 21 *supra,* p 494. Interpretive "rules" are invalid if they do more than specify the application of a legislative purpose implicit in the general language used by the legislature, if they conflict with the governing statute, if they extend or modify the statute, or if they have no reasonable relationship to a statutory purpose. See 1 Cooper, *supra,* pp 252-259.

public of the agency's construction of the law it administers."²⁷

Further, the fact that persons may conform their behavior to the interpretations does not mean that the interpretations are legislative rules. The "pragmatic consequences" of interpretive "rules" is that they are published as "declaration[s] of the proper interpretation of the law, and those affected will normally conform, since the regulation provides a practical guide as to how the office representing the public interest in enforcing the law will apply it."²⁸

D

Underlying many of the arguments of Clonlara and McConnell is the sense that these procedures must be legislative rules rather than interpretive statements because they have a substantial effect. The dissent adopts this argument, and on that basis would hold that the 180-day school year requirement is invalid. The argument that substantive statements are enforceable rules when the agency has not been granted legislative authority to promulgate rules has not been followed in Michigan, and has been rejected by the federal courts.²⁹

²⁷ Schwartz, Administrative Law (2d ed), § 4.6, p 159 (emphasis added).

²⁸ Id., pp 159-160.

All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent. . . . Courts are not bound by an agency's interpretation, . . . but parties regulated by the statute are. . . . "[A]ll rules are 'binding' on the regulated parties in the sense that they set, for the time, the legal minima of behavioral standards." [*Wayne Twp Metropolitan School Dist*, n 21 *supra*, p 493.]

²⁹ See *Wayne Twp Metropolitan School Dist*, n 21 *supra*, p 493; "[T]he test is not substantial impact but is exercise of delegated power to make law through rules . . . ." 2 Davis, n 18 *supra*, § 7:8, p 39.

The compliance procedures do not create or destroy rights. A home school parent may ignore the compliance procedures at the risk of having the department seek a hearing under § 4 of the nonpublic school act. At such a hearing, it is the underlying statute that would control whether the home school parent violated the law, not the department's interpretation. At such a proceeding, the department would seek to convince a court that its interpretation of the statute is correct and that in fact the parents had violated the statute. The department must show violation of the statute, not violation of an interpretive rule.

V

The dissent would hold that because the 180-day school year requirement has the effect of a rule, it is an invalid rule rather than an invalid interpretation. An invalid interpretation cannot, however, become an invalid rule unless the agency is empowered to promulgate rules.[30]

---

[30] Professor Anthony, in an article relied on by the dissent, acknowledges this point at the outset. He wrote:

Legislative rules *can readily* be differentiated from those that are nonlegislative. The fundamental idea is that a "legislative rule is the product of an exercise of *delegated* legislative power to make law through rules." More particularly, a rule qualifies as legislative if all of the following requirements are met: 1) The agency must possess *delegated* statutory authority to act with respect to the subject matter of the rule. 2) Promulgation of the rule must be an intentional exercise of that delegated authority. 3) The agency must also possess *delegated* statutory authority to make rules with the force of law. 4) Promulgation of the rule must be an intentional exercise of authority to make rules with the force of law. 5) Promulgation of the rule must be an effective exercise of that authority. 6) The promulgation must observe procedures mandated by the agency's organic statute and by the APA . . . . An agency's issuance is a valid legislative rule if and only if it meets all six of these requirements. *All substantive rules that do not fit this template are nonlegislative. They are either interpretive rules (if they*

On the same principle that a person cannot be prosecuted for violating a law that he is not obliged to obey, an agency that has not been granted rule-making authority is not obliged to follow rule-making procedures. The Legislature may require an agency to follow APA rule-making procedures by empowering the agency to make rules. When it fails to so empower an agency, the agency need not follow the APA rule-making procedures.[31]

Reliance in the dissent on Michigan and federal precedent is misplaced. In all the Michigan cases relied on by the dissent, the issue was whether an agency that had been granted rule-making authority was required to comply with APA procedures.

Courts look at the substance or effect of agency action when an agency has been empowered to make rules because of the need to prevent the agency from seeking to accomplish the goals of rule making without observing the APA procedural requirements for rule making. None of the cases relied on by the dissent holds that an agency, not empowered to make rules, had promulgated an invalid rule because it had failed to follow the APA procedures.

In *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Services,* 431 Mich 172; 428 NW2d 355 (1988) the DSS was required[32] to promulgate rules providing procedures for hearings where a person contests the denial or reduc-

---

*interpret specific statutory or regulatory language) or policy statements (if they do not).* [Anthony, *Interpretive rules, policy statements, guidances, manuals and the like—Should federal agencies use them to bind the public?* 41 Duke L J 1311, 1321-1323. Citations omitted, emphasis in original, except emphasis added preceding 6.]

[31] See n 16 for examples of where the Legislature has given the Department of Education rule-making authority.

[32] See MCL 400.9(1); MSA 16.409(1).

tion of public assistance. At issue was whether the
DSS could change such hearing procedures through
the issuance of what it labeled a policy bulletin
and thereby avoid the rule-making requirements
of the APA. This Court, in holding that the agency
was required to observe the APA, wrote that "[t]he
only relevant statutory provision *mandates* that
the department conduct hearings pursuant to pro-
mulgated rules."[33] (Emphasis added.)

Similarly, in *Farm Bureau,* petitioners chal-
lenged letters of the Director of the Bureau of
Workmen's Compensation, establishing new rate
schedules as rules on the basis that the changes
should have been promulgated under the APA. The
Workers' Disability Compensation Act provided
that the director, in accordance with the APA,
" 'may make rules not inconsistent with this act
for carrying out the provisions of the act . . . . ' "[34]

It may, indeed, be sound policy and a sound

[33] *Coalition for Human Rights,* n 17 *supra,* 431 Mich 188.

[34] *Farm Bureau,* n 15 *supra,* 408 Mich 156. Some of the other cases
relied upon by the dissent where the agency had been granted rule-
making authority include *Jordan v Dep't of Corrections,* 165 Mich
App 20; 418 NW2d 914 (1987); *Thompson v Dep't of Corrections,* 143
Mich App 29; 371 NW2d 472 (1985); *Schinzel v Dep't of Corrections,*
124 Mich App 217; 333 NW2d 519 (1983), all of which dealt with
Department of Corrections actions not taken through APA procedures
but that directly affected prisoner's rights. The Director of the De-
partment of Corrections is empowered under MCL 791.206(3); MSA
28.2276(3) to "promulgate further rules with respect to the affairs of
the department as the director considers necessary or expedient for
the proper administration of this act." In *Mallchok v Liquor Control
Comm,* 72 Mich App 341; 249 NW2d 415 (1976), the Court of Appeals
held that the commission was obliged to follow APA procedures under
MCL 436.7; MSA 18.977, which provided that "[t]he commission shall
adopt rules and regulations governing the carrying out of this act and
the duties and responsibilities of licensees in the proper conduct and
management of their licensed places." In *Baker v State Bd of Den-
tistry,* 63 Mich App 729, 732; 235 NW2d 157 (1975), the Court of
Appeals proceeded on the basis that rule-making authority had been
granted to the State Board of Dentistry. The Court expressed concern
regarding the undefined nature of the grant of legislative authority to
the board. (The relevant provisions have since been repealed.)

Federal precedent cited by the dissent in which the agency had
been granted rule-making authority include *Columbia Broadcasting*

construction of the APA, to hold that substance and
effect are determinative and that an agency must
act through APA rule-making procedures when it
has been authorized by the Legislature to promul-
gate rules. But, as Professor Davis stated in a
section of his treatise entitled "Can Substantial
Impact of Rules Give Them Force of Law if Con-
gress Has Delegated to the Agency No Power to
Make Rules Having Force of Law?":

> The idea that substantial impact of rules may
> give them force of law seems on its face totally
> without merit. Full examination of the idea con-
> firms that it is totally without merit. [2 Davis
> Administrative Law (2d ed), § 7:16, p 76.]

The Department of Education is not authorized,
explicitly or implicitly, to promulgate rules relat-
ing to the nonpublic school act. Consequently,
action taken by the department cannot be an
invalid rule. The negative implication of Davis'
statement is that if substantial effect cannot give
rules the force of law—and thus constitute them
valid legislative rules—then substantial effect sim-
ilarly cannot make them invalid rules.

VI

We now consider whether the compliance proce-
dures are valid interpretations of the law. This
Court has said that the subsection 7(h) exception
for interpretive statements must be narrowly con-
strued "and requires that the interpretative state-

_System, Inc v United States,_ 316 US 407; 62 S Ct 1194; 86 L Ed 1563
(1942) (the FCC had been granted rule-making power), and _General
Motors Corp v Ruckelshaus,_ 239 US App DC 408; 742 F2d 1561 (1984)
(the EPA had been granted rule-making power under the Clean Air
Act).

ment at issue be merely explanatory." *Coalition for Human Rights, supra,* p 184.

The Court of Appeals found that three of the compliance procedures were not interpretive statements under subsection 7(h) because they exceeded the scope of the nonpublic school act or were not otherwise statutorily supported.[35]

A

The compliance procedures state that an instructor must have a valid teaching certificate recorded with the intermediate school district office.[36]

Section 2 of the nonpublic schools act[37] defines a private, denominational or parochial school as "any school other than a public school giving instruction to children below the age of 16 . . . ." Home schools are covered by the act because they are "any school other than a public school."

---

[35] We do not address any of the other compliance procedures because they have not been addressed by the Court of Appeals.

The Court of Appeals said:

The specific regulations set forth in the procedures on the basis of the broad general intent of the nonpublic school statute do not constitute mere explanation of the statute's requirements. There is no requirement in the School Code, MCL 380.1 *et seq.*; MSA 15.4001 *et seq.* or in the nonpublic school act mandating interactive face-to-face teacher-student contact. Further, while there is a statutory requirement that certain subjects are to be taught, these subjects do not include social studies and science, which the procedures require. Furthermore, the requirement under the procedures that instruction by a certified teacher encompass 900 hours or 180 days of instruction each school year ·is not a mere explanation of the nonpublic school act. There is no clear legal duty for a school district to provide 180 days of instruction under the School Code, MCL 380.1284(1); MSA 15.41284(1), or the State School Aid Act, MCL 388.1701(2); MSA 15.1919(1001)(2). *State Bd of Ed v Houghton Lake Community Schools,* 430 Mich 658, 678; 425 NW2d 80 (1988). [188 Mich App 338-339.]

[36] Testimony indicates that a permit would be acceptable to the department.

[37] MCL 388.552; MSA 15.1922.

Section 1[38] states that "[i]t is the intent of this act that the sanitary conditions of such schools, the courses of study therein, *and the qualifications of the teachers thereof* shall be of the same standard as provided by the general school laws of the state." (Emphasis added.) This section, then, requires that nonpublic schools provide comparable education, including teacher qualifications, as public schools.

Section 3[39] provides:

No person shall teach or give instruction in any of the regular or elementary grade studies in any private, denominational or parochial school within this state who does not hold a *certificate such as would qualify him or her to teach in like grades of the public schools of the state* . . . . [Emphasis added.]

School Code § 1233[40] provides, with a few exceptions, that "the board of a school district or intermediate school district shall not permit a teacher who does not hold a valid teaching certificate to teach in a grade or department of the school . . . ." Under this provision, all instruction in public schools is conducted by certified teachers.

Reading these four provisions in conjunction leads to the conclusions that 1) home schools are covered by the nonpublic school act because they are schools "other than a public school";[41] 2) as a school, "other than a public school" home schools are required to provide instruction by a teacher who would otherwise be qualified to teach in the public schools; 3) all hours of instruction in home

---

[38] MCL 388.551; MSA 15.1921.

[39] MCL 388.553; MSA 15.1923.

[40] MCL 380.1233(1); MSA 15.41233(1).

[41] MCL 388.552; MSA 15.1922. This view was accepted by both sides at trial and by the circuit court and the Court of Appeals.

schools must be conducted by certified teachers, because School Code § 1233[42] requires that all teaching in public schools be done by certified teachers and the nonpublic school act[43] mandates that nonpublic schools meet the same standards as public schools.

Today, in *People v DeJonge (After Remand),* 442 Mich 266; 501 NW2d 127 (1993), this Court holds that the teacher certification requirement is unconstitutional when it infringes on a parent's First Amendment free exercise rights. And, in *People v Bennett (After Remand),* 442 Mich 316; 501 NW2d 106 (1993), a majority of the Court sustains the constitutionality of the teacher certification requirement against a challenge claiming that the requirement is violative of substantive due process.[44]

B

There is no statutory basis for the department to require that home schools have school years that last a minimum of 180 days. The 180-day requirement goes beyond the scope of the enabling statutes and is therefore an invalid interpretation.

This Court, in *State Bd of Ed v Houghton Lake Community Schools,* 430 Mich 658; 425 NW2d 80 (1988), considered whether the State Board of Education could compel a local board of education to provide 180 days of instruction in a school year. It construed § 1284(1)[45] of the School Code and State School Aid Act, § 101,[46] which both provide that the minimum number of days for student instruction shall be 180 days. The Court held that these

[42] MCL 380.1233; MSA 15.41233.
[43] MCL 388.551; MSA 15.1921.
[44] See n 25 and accompanying text.
[45] MCL 380.1284(1); MSA 15.41284(1).
[46] MCL 388.1701; MSA 15.1919(1001).

provisions do not contain an absolute mandate of 180 days. Rather, they state that if a district does not hold school for 180 days, the district will forfeit some of its state aid.

There is thus no requirement that public schools be in session 180 days. As a result, the board cannot base the 180-day school year requirement for home schools on an analogy to or comparability of public school requirements.

Nothing in the nonpublic school act indicates that nonpublic schools must be in session for 180 days. That the average school year in the state and the nation is 180 days does not support the 180-day interpretation.

C

The requirement that home schools teach social studies and science is supported by several statutory provisions. The compulsory attendance act requires that a nonpublic school child attend a nonpublic school "which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade . . . ."[47] There was testimony that all public schools teach social studies and science. The Legislature has identified science and history courses as among those that public schools must provide.[48]

---

[47] MCL 380.1561(3)(a); MSA 15.41561(3)(a).

[48] MCL 380.1171; MSA 15.41171 provides that public schools should provide instruction on the "humane treatment and protection of animals and birds" and their role in the economy of nature; MCL 380.1171a; MSA 15.41171(1) mandates that schools provide education for students in their relationship to nature and the land; MCL 380.1166; MSA 15.41166 mandates that schools provide education for students in civics and history; MCL 380.1173(1); MSA 15.41173(1) mandates that the appropriate authorities of a public school give special attention to the degree to which instruction materials, including social studies textbooks, reflect the pluralistic, multiracial, and multiethnic nature of our society. See also MCL 712A.2(a)(4), (b)(1)(A);

VII

The decision of the Court of Appeals, which held that the compliance procedures were invalid because they were not promulgated in accordance with the APA, is reversed.

The teacher certification and social studies and science requirements are valid interpretations of the relevant statutory provisions.

The 180-day school year requirement is not valid.

We make no decision concerning the correctness of any of the other compliance procedures or interpretations that were not addressed in the circuit court or the Court of Appeals or raised on appeal in this Court.

CAVANAGH, C.J., and BRICKLEY, BOYLE, and MALLETT, JJ., concurred with LEVIN, J.

RILEY, J. (*concurring in part and dissenting in part*). Because I find that the Department of Education's Nonpublic School and Home School Compliance Procedure which mandates that private and home schools provide 180 days of education is an invalidly promulgated rule in violation of the Administrative Procedures Act, MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.*, I write separately.[1]

I

On October 8, 1986, defendant State Board of Education adopted guidelines entitled "Nonpublic School and Home School Compliance Procedures"

MSA 27.3178(598.2)(a)(4), (b)(1)(A) stating that parents must provide an education to their children, including science and social studies classes, to avoid charges of neglect.

[1] I agree with the majority that the other procedures at issue were valid interpretative statements pursuant to the APA.

by which to enforce the nonpublic school act, MCL
388.551 *et seq.*; MSA 15.1921 *et seq.* The proce-
dures were not promulgated pursuant to the APA.
The procedures were routinely mailed by defen-
dant to known home school families, as well as to
school districts as "staff instructions" "to carry out
the law . . . ."

The procedures state that they were adopted by
defendant on authority of law,[2] and claim to define
the "legal requirements" of home schools. Specifi-
cally, they direct that "[a] home school will have
met the legal requirements if," inter alia, (1) a
certificated instructor is utilized, (2) there are 180
days of instruction, and (3) "a comparable program
[to public schools] of instruction" is utilized, in-
cluding classes in social studies and science. Recip-
ients are also instructed to complete and file at-
tached information forms to defendant to evidence
compliance with the procedures. The form requests
the "name of certified teacher giving instruction,"
the areas of instruction, and the number of days a
year instruction is given. The procedures do not
explain that they are not mandatory or that they
are merely defendant's interpretations of the law.

At issue in the instant case is the application of
the APA to the procedures. The Court of Appeals
held that the procedures were invalidly enacted
rules in violation of the APA;[3] the majority finds
that the procedure mandating 180 days of school
was an invalid interpretative statement of the law,
while the other procedures were valid interpreta-
tive statements of the law.[4]

---

[2] The procedures explicitly refer to MCL 388.551-388.558; MSA
15.1921-15.1928, MCL 380.1561 *et seq.*; MSA 15.41561 *et seq.*, MCL
380.653; MSA 15.4653, as well as unpublished opinion of the Attorney
General, 1961-1962, M-576 (May 18, 1961); OAG, 1979-1980, No 5579,
p 416 (September 27, 1979).

[3] 188 Mich App 332, 341; 469 NW2d 66 (1991).

[4] *Ante* at 245-248.

## II

### A

Michigan's citizens confront a monolithic and sprawling state bureaucracy touching nearly every aspect of their lives.[5] Undreamed of by the Founding Fathers, the advent of the modern bureaucratic state shifted a large amount of lawmaking traditionally vested in the Legislature into often insular administrative agencies that appear largely unaccountable for their day-to-day activities.[6] The growth and pervasive influence of this unwieldy bureaucratic structure in Michigan was so acute in the recent past that members of the Michigan Constitutional Convention of 1961 referred to the state apparatus as a "labyrinth of horrors or chamber of horrors" resulting in "'administrative disintegration'" due to its overwhelming complexity and unaccountability. 2 Official Record, Constitutional Convention, p 1837 (comments of Mr. Bentley) (citation omitted). In response, the bureaucracy was bridled, in part, by its creator through the enactment of the APA.[7]

In Michigan, the exercise of legislative authority duly delegated to administrative agencies is re-

[5] The pervasiveness of administrative agencies cannot be denied: administrative agencies grant or deny licenses to practice professions, operate businesses, drive automobiles, construct buildings, utilize natural resources, and determine the use of land. Bienenfeld, Michigan Administrative Law (2d ed), § 1, p 2. Agencies also "settle labor disputes, set the amount of taxes to be paid, grant paroles to inmates of penal institutions, fix rates for public utilities, determine welfare benefits, employment security benefits, worker's disability benefits and the rights of public employees, and resolve election disputes and disputes arising from discrimination based on race, color, national origin, sex, age, and physical disability." Id.

[6] The massive increase in administrative agencies has been justified by legislators as a means "to cope with massive social, economic, political, and environmental problems that accompanied advances in technology, changes in social structure, increases in population, and greater concentrations of population." Bienenfeld, n 5 supra, § 3, p 1.

[7] For a thorough examination of the history of the APA, see Bienen-

ferred to as rule making, and the APA prohibits rule making without undergoing strict public scrutiny through "public hearings, public participation, notice, approval by the joint committee on administrative rules, and preparation of statements, with intervals between each process." *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Services,* 431 Mich 172, 178; 428 NW2d 335 (1988).

The extensive notice and hearing procedures mandated by the APA " 'are calculated to invite public participation in the rule-making process, prevent precipitous action by the agency, prevent the adoption of rules that are illegal or that may be beyond the legislative intent, notify affected and interested persons of the existence of the rules, and make the rules readily accessible after adoption.' " *Id.* at 189-190, quoting Bienenfeld, Michigan Administrative Law (1st ed), § 4, p 4-1.

More important, the APA is essential to the preservation of a democratic society. Put simply, without public oversight and scrutiny of legislative action undertaken by administrative agencies, such agencies would rule without the normal safeguards of our republic. Indeed, the APA is a bulwark of liberty by ensuring that the law is promulgated by persons accountable directly to the people.[8]

---

feld, n 5 *supra,* § 3, pp 2-4. In addition to the APA, the Legislature enacted the Freedom of Information Act, MCL 15.231 *et seq.;* MSA 4.1801(1) *et seq.,* and the Open Meetings Act, MCL 15.261 *et seq.;* MSA 4.1800(11) *et seq.,* to ensure that agencies were accountable to the electorate. Furthermore, the people of Michigan placed significant constraints on administrative agencies through the enactment of the 1963 Constitution. The constitution, e.g., limits the number of agencies to twenty, art 5, § 2, mandates that appointments of heads of principal departments be subject to the advice and consent of the Senate, art 5, § 3, vests the Legislature with the ability to suspend any rule or regulation promulgated by an agency between sessions, art 4, § 37, and vests in the Governor a broad power to reorganize agencies to promote efficiency, art 5, § 2.

[8] See, e.g., *Coalition for Human Rights, supra* at 177-178 (noting

Accordingly, this Court has noted that a rule is valid only " 'if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable.' " *Michigan Farm Bureau v Workmen's Compensation Bureau,* 408 Mich 141, 149; 289 NW2d 699 (1980), quoting 1 Davis, Administrative Law, § 5.03, p 299 (emphasis omitted). Hence, "[a] rule that does not comply with the procedural requirements of the APA is invalid under Michigan law." *Coalition for Human Rights, supra* at 183.[9]

The Legislature, therefore, to ensure that the APA effectively maintains public supervision over administrative agencies, broadly defined "rule" in the APA:

> "Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or recision thereof . . . . [MCL 24.207; MSA 3.560(107).]

that because agency rules have "serious consequences of law for many people," the Legislature enacted the APA to ensure that the " 'essential functions of the legislative process' " are adhered to; hence, whether an agency violates the APA "is a question of the allocation of decision-making authority"); *Jordan v Dep't of Corrections,* 165 Mich App 20, 30; 418 NW2d 914 (1987) (T. K. BOYLE, J., concurring) ("[t]he promulgation and publication of rules by agencies is healthy, not only for the public, but for the agencies themselves. It is of the essence of democratic self-government that the rule-maker be subject to the law").

[9] In fact, the failure to provide or comply with such procedures could quite possibly conflict with the constitution's general edicts of providing a republican form of government. See, e.g., art 1, § 1 ("[a]ll political power is inherent in the people"); art 1, § 17 ("[n]o person shall . . . be deprived of life, liberty or property, without due process of law"); art 4, § 1 ("[t]he legislative power . . . is vested" in the Legislature); art 4, § 20 (mandating open meetings of the Legislature); art 4, § 26 (mandating publication of bills); art 4, § 35 (mandating publication of laws and judicial decisions).

On the other hand, the Legislature, recognizing that administrative agencies must be permitted sufficient flexibility to effectively execute the law, exempted from the definition of a rule, inter alia, interagency memoranda, MCL 24.207(g); MSA 3.560(107)(g), interpretive guidelines and statements, MCL 24.207(h); MSA 3.560(107)(h), and decisions by an agency to exercise or not to exercise a permissive statutory power, MCL 24.207(j); MSA 3.560(107)(j).[10]

Nevertheless, this Court has recognized that the broad definition of "rule" was specifically designed to "defeat the inclination of 'agencies to label as "bulletins," "announcements," "guides," "interpretive bulletins," . . . which, in legal operation and effect, really amount to rules . . . .' " *Coalition for Human Rights, supra* at 183, quoting 1 Cooper, State Administrative Law, p 108. Acknowledging the vital importance of maintaining public control over administrative agencies and the underlying purpose of the APA, Michigan courts "have shown a strong tendency to require agencies to act pursuant to formal rules rather than through informal policies." *Spruytte v Walters,* 753 F2d 498, 505 (CA 6, 1985).

---

[10] MCL 24.207; MSA 3.560(107) provides:

(g) An intergovernmental, interagency, or intra-agency memorandum, directive, or communication that does not affect the rights of, or procedures and practices available to, the public.

(h) A form with instructions, an interpretive statement, a guideline, an informational pamphlet, or other material that in itself does not have the force and effect of law but is merely explanatory.

* * *

(j) A decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected.

B

Defendant maintains that because it has no rule-making authority, even though the guidelines may have substantially affected plaintiffs, at worst it misinterpreted the law and did not violate the APA. The majority agrees.[11]

Contrary to the conclusions of the majority, I find that the guideline mandating 180 days of school is an invalid rule promulgated in violation of the APA. When an agency "does not merely interpret, but sets forth onto new substantive ground through rules that it will make binding, the agency must observe the legislative processes laid down by" the Legislature. Anthony, *Interpretive rules, policy statements, guidances, manuals, and the like—Should federal agencies use them to bind the public?* 41 Duke L J 1311, 1314 (1992).[12] Professor Anthony cautions that while guidelines like the one at issue "by definition cannot *legally* bind, agencies often inappropriately issue them

[11] This position has some support. See, e.g., *Wayne Twp Metropolitan School Dist v Davila,* 969 F2d 485, 489 (CA 7, 1992).

[12] See, e.g., *Coalition for Human Rights, supra* at 184-185; *Jordan,* n 8 *supra* at 27 ("[a] policy directive cannot be considered an 'interpretive statement' of a rule if it is in fact inconsistent with the rule or contains provisions which go beyond the scope of the rule"); *Thompson v Dep't of Corrections,* 143 Mich App 29, 32; 371 NW2d 472 (1985) ("the directive could not be considered an 'interpretative statement' if it were inconsistent with the rules or contained provisions which went beyond the scope of the rules"); *Schinzel v Dep't of Corrections,* 124 Mich App 217, 221; 333 NW2d 519 (1983) ("the defendants' policy directive equating postage stamps, the importation, exportation, or possession of which is clearly not prohibited by law, with contraband cannot be deemed an interpretative statement of what 'contraband' means; it changes that term's very definition"); *Mallchok v Liquor Control Comm,* 72 Mich App 341, 347; 249 NW2d 415 (1976) (holding that the Liquor Control Commission's policy not to grant licenses for a specially designated distributor within a half mile of another SDD license was invalid because it had not been promulgated according to the APA); *Baker v State Bd of Dentistry,* 63 Mich App 729, 732-733; 235 NW2d 157 (1975) (striking down a suspension of a dentist for operating a branch office because the guidelines under which he was sanctioned were not properly promulgated pursuant to the APA).

with the intent or effect of imposing a *practical* binding norm upon the regulated or benefited public." *Id.* at 1315. See *Farm Bureau, supra* at 162-163 (LEVIN, J.); *Jordan v Dep't of Corrections,* 165 Mich App 20, 29; 418 NW2d 914 (1987). Hence, if an agency policy was adopted without complying with APA procedures and has the effect of a rule, it is an invalidly promulgated rule. *Coalition for Human Rights, supra* at 188, quoting *Schinzel v Dep't of Corrections,* 124 Mich App 217, 219; 333 NW2d 519 (1983).[13]

Nevertheless, the majority holds that policies that clearly contradict or extend beyond their statutory foundations are merely misinterpretations of the statute, even if they possess the effect of law. Such reasoning eviscerates the dictates of the APA. The majority incorrectly dismisses the real-world possibility that an agency without statutory authorization to promulgate rules may still attempt to issue a rule with the force of law without conforming to the APA.[14] The majority permits the APA to be easily circumvented by an

---

[13] The agency's label is *not* dispositive and the inquiry must focus on the "actual action undertaken by the directive, to see whether the policy being implemented has the effect of being a rule."

[14] Professor Anthony reveals with regard to federal agencies that "it is manifest that nonobservance of APA rulemaking requirements is widespread." Anthony, *Interpretive rules, supra* at 1316. In fact, Professor Anthony examines sixteen instances in which federal agencies utilized nonlegislative policy documents in direct enforcement, twelve instances in which federal agencies had utilized such documents to pass upon applications, five instances in which federal agencies had utilized such documents in benefit programs, and seven such documents utilized by federal agencies affecting programs administered by the states. *Id.* at 1332-1355.

Exacerbating the tendency of agencies to ignore the APA is the infrequency of legal challenges to such rules "because the affected private parties cannot afford the cost or the delay of litigation, or because for other practical reasons they must accept a needed agency approval or benefit on whatever terms the agency sets." *Id.* at 1316-1317.

agency that enacts policies that are in effect bind-
ing and later claims that because it was not vested
with rule-making power, its policy was valid as a
proper interpretation of the law or, at most, a
misinterpretation of the law. Meanwhile, the lives
of thousands, if not millions, of citizens would have
been dictated by purported nonrules promulgated
by agencies without public participation and in
contradiction to the will of the Legislature.[15] Such
unauthorized lawmaking not only violates the APA,
but threatens the principles of republican govern-
ment. Administrative agencies' policies have a
substantial effect on the everyday lives of Michi-
gan's citizens, and simply because an agency de-
clares that it has no rule-making authority, or is
not exercising that authority, should not enable it
to act with impunity in violation of the law.[16]

Furthermore, the majority fails to inquire into
the effect of the procedures at issue, and mistak-
enly asks only whether the 180-day requirement
was legally binding.[17] The correct inquiry should

[15] Moreover, "[a]ffected members of the public are likely to be
confused or misled about the reach and legal quality of the standards
the agency has imposed." Anthony, *Interpretive rules, supra* at 1317.
Even "more costly yet is the tendency to overregulate that is nur-
tured when the practice of making binding law by guidances, manu-
als, and memoranda is tolerated. If such nonlegislative actions can
visit upon the public the same practical effects as legislative actions
do, but are far easier to accomplish, agency heads (or, more fre-
quently, subordinate officials) will be enticed into using them." *Id.*

[16] The Legislature did not intend that the policy, scope and
requirements of the [APA] be so easily circumvented. Agency
pronouncements within the definition of a rule may have the
practical force and effect of a rule although the agency has not
observed the notice and comment requirements of the APA.
[*Farm Bureau, supra* at 162-163.]

[17] Although documents were plainly nonlegislative (because
they were not promulgated by notice-and-comment procedures),
courts nevertheless in many cases have regularly asked
whether such documents "are" legislative rules, rather than
interpretive rules or policy statements. This method of framing
the issue begs the real question . . . . For precision's sake, we

have been whether the agency's actions were intended or had the effect of binding those affected by the policy. *Coalition for Human Rights, supra* at 188.[18]

C

"In general, a nonlegislative document is binding as a practical matter if the agency treats it the same way it treats a legislative rule—that is, as dispositive of the issues that it addresses—or leads the affected public to believe it will treat the document that way." Anthony, *Interpretive rules, supra* at 1328. See also *Community Nutrition Institute v Young*, 260 US App DC 294, 298-300; 818 F2d 943 (1987). "Certain indicia that nonlegislative documents are binding in this practical sense are clearly identifiable." Anthony, *Interpretive rules, supra* at 1328. For example, "agency *enforcement action* based upon nonobservance of the nonlegislative document, or the threat of such action, bespeaks a clear intent to bind and indeed puts it into execution. Here the eating is the proof of the

must insist that these documents cannot "be" legislative rules, as they were not issued legislatively. What the courts in these cases plainly were looking for was whether the agency was *trying* to issue a rule that was legislative in nature. . . . In short, did the agency's nonlegislative action bind or attempt to bind the affected public? [Anthony, *Interpretive rules, supra* at 1327.]

[18] Thus, the proper question in these cases is not whether the policy document *is* a legislative rule. Rather, the proper question is whether the nonlegislative document *should have been* issued as a legislative rule in the circumstances. The key to that question is [clear]: *Did the agency intend the document to bind? Has the agency given it binding effect?* If the answer to either of these questions is "yes," the document should have been issued as a legislative rule. [Anthony, *Interpretive rules, supra* at 1327. Or, when the agency does possess no rule-making authority, not at all.]

pudding." *Id.*[19] Moreover, although an agency may state that it did not intend its policies to be binding, the court must examine whether the agency acted as if it were binding or had such an effect. *Columbia Broadcasting System, Inc v United States,* 316 US 407, 416; 62 S Ct 1194; 86 L Ed 1563 (1942) ("[t]he particular label placed upon [a regulation] is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive").[20] Furthermore, whether "private parties are reasonably *led to believe* that failure to conform will bring adverse consequences, such as enforcement action or denial of an application," is vital to this determination. Anthony, *Interpretive rules, supra* at 1328. Other factors include whether the private parties participated in the formulation of the policy, and the ease by which to challenge the documents. *Id.* at 1330. Moreover, when a policy affects the rights of those it binds or creates substantial changes in substantive law, the procedure is a rule. *Coalition for Human Rights, supra* at 188-189.[21] Similarly, if the procedure contradicts the

---

[19] See, e.g., *Jerri's Ceramic Arts v Consumer Products Safety Comm,* 874 F2d 205, 208 (CA 4, 1989); *Young, supra* at 299; *Chamber of Commerce of the United States v OSHA,* 204 US App DC 192, 196, 197, n 7; 636 F2d 464 (1980).

[20] See also *General Motors Corp v Ruckelshaus,* 239 US App DC 408, 412; 742 F2d 1561 (1984) ("if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule"); *Detroit Edison Co v United States Environmental Protection Agency,* 496 F2d 244, 249 (CA 6, 1974) ("the mere invocation by EPA of the statutory exceptions for interpretative rules is not dispositive as to whether the general rulemaking requirements of the APA are applicable"); *Lewis-Mota v Secretary of Labor,* 469 F2d 478, 481-482 (CA 2, 1972) ("the label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact").

[21] See also *Jordan, supra* at 29 (holding that a policy directive was invalid because it affected "the rights of the public, and changed, rather than merely explained, the terms of the rule it purported to interpret"); *Schinzel, supra* at 220-221 (holding a rule invalid because

law, it is an invalidly promulgated rule in violation of the APA. *Id.*[22]

In the instant case, the 180-day procedure meets the basic definition of a rule as defined in § 7 of the APA and possesses the indicia of a binding policy. The 180-day procedure is clearly "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability, that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency . . . ."[23] Moreover, the procedure has a binding effect. First, defendant acted as if the procedure were binding. The procedures were mailed to all known home schools and directed recipients to return an information form that required adherence to the procedures. Defendant enforced the procedure as it enforced all statutory mandates, and instructed intermediate school districts to en-

_____

it altered the statutory definition of the authority on which it was based).

[22] In *Coalition for Human Rights, supra* at 188-189, this Court held that an administrative policy directive that was "binding and affect[ed] the rights of the public" was an invalidly promulgated rule:

> The new procedures are not merely mechanical details for the conduct of hearings, but, rather, represent substantial changes in the detailed requirements for the conduct of fair hearings to determine claimants' rights under the Social Welfare Act and applicable federal law. . . . This policy bulletin represents an alteration of the present rules and therefore must be promulgated as a rule under the proper procedures set out by the APA.
>
> In sum, the telephone hearing policy is inconsistent with the existing rules and therefore cannot be implemented without benefit of rulemaking.

This Court concluded that "[t]he telephone hearing procedure has the full force and effect of law and represents an alteration or change from the rule. The department's effort to change substantially the manner in which it conducts its hearings solely through an internal policy bulletin and manual revision undermines the fundamental purpose of the APA . . . ." *Id.* at 189.

[23] MCL 24.207; MSA 3.560(107).

force the procedure as law. Second, parents who received the procedure undoubtedly understood it to be binding because it declared that it was authorized and defined by the law.[24] Finally, as found by the majority, the 180-day requirement does not meet the APA's exceptions because it contradicts the nonpublic school act; that act does not mandate 180 days of school for nonpublic schools.[25] Although defendant recognized that the procedure was not legally binding, its actions practically bound home schools in violation of the APA. The majority is correct in its conclusion that the 180-day requirement cannot legally bind, but ignores the practical and substantial effect of the guidelines. Regardless of the labels defendant attempts to place on the procedure, it possessed no power to dictate a 180-day requirement; that procedure, therefore, was an invalidly promulgated rule in violation of the APA.

GRIFFIN, J., concurred with RILEY, J.

[24] See *Young, supra* at 298 (noting that "[t]he language employed by FDA in creating and describing action levels suggests that those levels both have a present effect and are binding").

[25] *State Bd of Ed. v Houghton Lake Community Schools,* 430 Mich 658, 678; 425 NW2d 80 (1988) ("[t]here is no clear legal duty of [a] school district to provide 180 days of instruction").